# IN THE SUPREME COURT OF TEXAS

═══════════
No. 17-0634
═══════════

IN RE VERNA FRANCIS COLEY THETFORD, RELATOR

════════════════════════════════
ON PETITION FOR WRIT OF MANDAMUS
════════════════════════════════

**Argued October 10, 2018**

CHIEF JUSTICE HECHT delivered the opinion of the Court as to Parts I, II, III-A, and IV, in which JUSTICE GREEN, JUSTICE GUZMAN, JUSTICE LEHRMANN, and JUSTICE BOYD joined, and a concurring opinion as to Part III-B, in which JUSTICE GREEN and JUSTICE GUZMAN joined.

JUSTICE BROWN filed a dissenting opinion, in which JUSTICE DEVINE, JUSTICE BLACKLOCK, and JUSTICE BUSBY joined.

A guardianship is a court-sanctioned infringement of an incapacitated person's right to control her own property, liberty, and life in order "to promote and protect [her] well-being".[1] A guardian can provide essential care for the ward. But tragically, wards are also vulnerable to neglect, abuse, and exploitation.[2] There are more than 51,000 open guardianships in Texas,[3] 8% more than

---

[1] TEX. EST. CODE § 1001.001(a).

[2] *See generally* Claudia Laird & Darlene Payne Smith, *Elder Abuse: The Criminal Aspects of Estates & Guardianships, and Mental Commitments*, 10 EST. PLAN. & COMMUNITY PROP. L.J. 225 (2018) (discussing abuse of elderly wards in Texas).

[3] TEX. OFFICE OF COURT ADMIN., TEXAS GUARDIANSHIP REFORM: PROTECTING THE ELDERLY AND INCAPACITATED 2 (2019), http://www.txcourts.gov/media/1443314/texas-guardianship-reform_jan-2019.pdf.

there were five years ago.[4] And the number is growing, as the number of Texans over age 65 is expected to double by 2030, to six million.[5] Guardianship proceedings must ensure the appointment of guardians who will promote and protect the well-being of the incapacitated elderly and the disabled.

Guardianship proceedings present difficult ethical issues for lawyers. Generally, a lawyer must act in a client's best interests, but guardianship cases can be emotionally charged. A ward's best interests may be hotly disputed and, because of her incapacity, difficult to discern. The issue before us is whether the Texas Disciplinary Rules of Professional Conduct[6] require that a lawyer be disqualified from representing one client who is applying to be appointed guardian for another current or former client, without that client's consent. We hold that the rules permit the representation in limited circumstances and that a trial court's decision regarding disqualification, based on a careful, thorough consideration of all the evidence, is entitled to great deference by an appellate court. We conclude that the trial court in this case did not abuse its discretion by refusing to disqualify counsel for the guardianship applicant. Accordingly, we deny mandamus relief.

---

[4] *Id.*

[5] *Id.*

[6] TEX. DISCIPLINARY RULES PROF'L CONDUCT, *reprinted in* TEX. GOV'T CODE tit. 2, subtit. G, app. A (TEX. STATE BAR R. art. X, § 9). All references to rules are to these rules unless otherwise noted.

# I[7]

Jamie Rogers was born in Graham, Texas (pop. 8,903), the county seat of Young County (pop. 18,550), located about 90 miles west–northwest of Fort Worth. All her life, her uncle and aunt, L.D. and Verna Thetford, also lived in Graham, and at all times material to this case, she and her husband, Larry, lived about a mile from the Thetfords. Verna once taught school but for many years was the bookkeeper for the cow–calf operation she and L.D. ran on five pastures totaling about 1,000 acres in Young and neighboring Jack Counties. As the Thetfords grew older, they relied on Jamie and Larry for support.

In March 2012, the Thetfords loaned the Rogerses $350,000 at 4% interest—more than the Thetfords were making on the funds at the bank—to purchase land that had belonged to Jamie's great-grandparents, Verna's grandparents. Alfred G. "Rusty" Allen, III, a lawyer practicing in Graham, represented the Thetfords in preparing the five-year note and the deed of trust. Jamie had worked for Allen's law firm as a legal assistant beginning when she was a senior in high school, though she was not working for the firm at the time of the loan. Allen was named trustee under the deed of trust.

---

[7] The trial court denied the motion to disqualify from the bench after a brief hearing then immediately proceeded to hear the application for temporary guardianship. The next day, before that hearing concluded, the court signed the order denying the motion to disqualify. "In determining whether a trial court abused its discretion, a reviewing court is generally bound by the record before the trial court at the time its decision was made." *In re M-I L.L.C.*, 505 S.W.3d 569, 574 (Tex. 2016) (orig. proceeding). But both sides here refer to evidence in the guardianship hearing, as well as evidence filed in the proceeding since the application was granted. That evidence might have caused the trial court to reconsider its denial of disqualification. *See Henderson v. Floyd*, 891 S.W.2d 252, 255 (Tex. 1995) (orig. proceeding) (per curiam) (after finding that the trial court had abused its discretion by denying the defendant's motion to disqualify plaintiff's counsel, commenting that the trial court could consider changed circumstances—whether the defendant had forfeited his motion—on remand). Accordingly, we consider all the evidence before the trial court that has been provided in this original proceeding.

In July 2015, Verna, then 84, executed a will and power of attorney, prepared by Allen. In the will, Verna left her estate to Jamie if she survived Verna, and if not, to Verna's heirs. The power of attorney designated Jamie as Verna's attorney-in-fact and her preferred guardian if the need arose and authorized Jamie to make healthcare decisions for Verna if she were unable to do so herself, "including the choice of nursing home facilities". Jamie was not working for Allen's firm at the time. A month later, L.D., then 92 and suffering from dementia, moved from his and Verna's home to Brookdale Graham, an assisted living center.

In 2016, Verna's mental state began to deteriorate. She verbally abused L.D. and his caregivers and interfered with their giving him his medications. Jamie and Larry assisted Verna in gathering her mail, running errands, and banking, but Verna often forgot what she had asked Jamie to do and accused Jamie of mismanaging her affairs. In December 2016, Verna was briefly admitted to the hospital twice, then transferred to Brookdale.

Though Verna's driver's license had been revoked, she continued to insist on driving. In February 2017, she convinced one of her caregivers to take her from Brookdale to her home, where she retrieved the keys to a pickup and drove to the feed store for supplies for her cattle. On the way home, she struck a trailer pulled by another vehicle and left the scene, at first denying what she had done and admitting to it only later. The trailer was minimally damaged, and no charges were filed. But the incident prompted Jamie to disable Verna's vehicles and to monitor her more closely at Brookdale. Verna accused Jamie of stealing the pickup.

The Rogerses' note to the Thetfords came due on March 15, with a $285,000 balloon payment still being owed. Believing that L.D. lacked the capacity to agree to extend the note and

4

concerned that Verna was in the same position, the Rogerses began efforts to refinance the note with a local bank but were still awaiting completion of an appraisal of the property when the note came due. Verna claimed that she asked Allen to write the Rogerses a demand letter but that he refused. Allen denies that Verna made the request. At the time, Jamie was working again for Allen's law firm. Verna asked a friend to drive her to the office of another Graham attorney, Stephen Crawford, who prepared a revocation of her power of attorney, which Verna executed in Crawford's office on March 27. Verna expressed to Crawford her desire to foreclose the deed of trust lien securing the Rogerses' note, and Crawford explained foreclosure would need to be initiated by Allen, the trustee, or Verna would need to appoint a successor trustee. Verna did not ask Crawford to write the Rogerses a demand letter.

Two weeks later, on April 10, Jamie, represented by Allen, filed an application for temporary guardianship of Verna's person and a management trust for her estate. Attached to the application was a physician's certificate of medical examination from Verna's personal physician, Dr. Pete Brown; his office notes from his examination of her on March 29; and his affidavit. Brown wrote in his office notes that Verna "presents with change in mental status" that "was noted several months ago. The course has been progressively worsening. It is of severe intensity." In his affidavit, Brown averred:

2.      I am a licensed medical doctor, authorized to practice medicine in the State of Texas and have been since 1980.

3.      Verna Francis Coley Thetford has been a patient of mine since 2006, and I have seen her regularly and frequently since that time.

5

4.      I last examined Mrs. Thetford on March 29, 2017, at which time I determined that she:

(A)     Is legally blind;

(B)     Is suffering from moderate dementia that is increasing in severity;

(C)     Has deficits in short-term memory, immediate recall, recognizing familiar objects and persons, solving problems, reasoning logically, and grasping aspects of her situation;

(D)     Lacks the ability to initiate and make business, managerial, and financial decisions;

(E)     Lacks the ability to make, modify, rescind or revoke contracts;

(F)     Lacks the ability to manage a personal bank account or her personal finances;

(G)     Lacks the ability [to] safely operate a motor vehicle;

(H)     Lacks the ability to make decisions regarding marriage;

(I)     Lacks the ability to determine her own residence; and

(J)     Makes poor decisions, has poor insight and judgment, and often acts irrationally.

5.      Based on my examination of Mrs. Thetford on March 29, 2017, I determined that Mrs. Thetford was, and is, incapacitated as that term is defined by Section 1002.017 of the Texas Estates Code, which states that an "Incapacitated Person" is an adult who, because of a physical or mental condition, is substantially unable to: (a) provide food, clothing, or shelter for himself or herself; (b) care for the person's own physical health; or (c) manage the person's own financial affairs. It is my professional opinion, based upon my knowledge of and involvement with Mrs. Thetford, that she has become an "Incapacitated Person" over the past several months.

The physician's certificate added that Verna's prognosis was "poor [and] increasing in severity" with no possibility of improvement, and that "no limitations [should be] placed on guardian's powers. Proposed ward needs assistance managing her affairs."

Brown's office notes stated that "Verna is here for a mental status exam, she is alone and states that she does not need help and never has. Her niece Jamie was suppose[d] to be her[e] but Verna has 'Revoked' her." His affidavit added:

> 6. I did not see Mrs. Thetford on March 27, 2017, the date on which she purportedly executed a document revoking a Statutory Durable Universal and Health Care Power of Attorney and Designation of Guardian Before Need Arises, and Directive to Physicians, executed on July 22, 2015, that she had previously executed appointing Jamie Kay Rogers as her agent and attorney in fact, medical power of attorney and guardian before need arises. However, Mrs. Thetford's dementia and diminished capacity has been ongoing and increasing in severity, especially during the past few months. Based upon my knowledge of and involvement with Mrs. Thetford and her condition, it is my diagnosis that her incapacity, as that term is defined by the Texas Estates Code, was persistent, ongoing, and very likely present on March 27, 2017, and for several months before such date.

Verna answered on April 17, represented by Robert E. Aldrich, Jr., an attorney in Fort Worth, and on April 28, moved to disqualify Allen as Jamie's counsel. The motion asserted that "Alfred G. Allen, III, at all times material to the matters involved in this proceeding, has represented [Verna]", that Allen had "obtained confidential information" during his representations of [Verna] that "could be used to [her] disadvantage . . . in the current matter", and that she objected to his representation of Jamie in violation of his fiduciary duties to her. The motion further alleged that Verna had asked Allen to foreclose the deed of trust lien securing her loan to the Rogerses and to help her change her will, but he had refused, and that "if successful in having Verna Thetford found

incompetent," Jamie would "cement[ her] ability to inherit all of [Verna's] property". Verna attached to her response to Jamie's application for a temporary guardianship a statement from Scott Hilborn, Ph.D., a clinical neuropsychologist in Fort Worth, who stated that he had examined Verna on April 19. She was accompanied, Hilborn said, by Eddie Dalton, a "family friend and former employee," who "served as an additional informant." According to Hilborn, Verna believed that Jamie had been prompted to have her deemed incompetent because the Rogerses' note was coming due. After administering several tests to Verna, Hilborn concluded: "She does not meet criteria for a dementia at this time and she has the capacity to live independently, reasonably determine her place of residence, make medical decisions, manage her medications in her own best interest, and make financial decision[s] in her own best interest at this time."

In a response to Verna's motion to disqualify Allen, Jamie asserted that the note to the Thetfords had been paid in full on April 28, with 18% interest for the delay. Jamie argued that "the Texas Disciplinary Rules of Professional Conduct place a mandatory duty on Allen to secure the appointment of a guardian for the person and . . . estate of Mrs. Thetford due to his reasonable belief that she lacks legal competence". Jamie's response cited Rule 1.02(g), which states:

> A lawyer shall take reasonable action to secure the appointment of a guardian or other legal representative for, or seek other protective orders with respect to, a client whenever the lawyer reasonably believes that the client lacks legal competence and that such action should be taken to protect the client.

L.D. died on April 29. On May 9, the trial court heard the motion to disqualify. Verna was represented by Aldrich and by an attorney ad litem appointed by the court, Toby L. Reddell, of Graham. Jamie was represented by Allen. Aldrich argued that "Allen admits his representation of

8

Ms. Thetford", had "made a judicial admission" to that effect, and had "continually represented my client for a long time". "I don't think," Aldrich continued, "given the fact that in his response Mr. Allen admits his representation of Ms. Thetford, that we need to put on a bunch of evidence." Aldrich argued that Allen's representation of Jamie without Verna's consent was a conflict of interest under Rules 1.06(a) and (b), which state:

> (a)     A lawyer shall not represent opposing parties to the same litigation.

> (b)     In other situations and except to the extent permitted by paragraph (c), a lawyer shall not represent a person if the representation of that person:

>> (1)     involves a substantially related matter in which that person's interests are materially and directly adverse to the interests of another client of the lawyer . . . ; or

>> (2)     reasonably appears to be or become adversely limited by the lawyer's or law firm's responsibilities to another client or to a third person or by the lawyer's . . . own interests.

Allen acknowledged that he was still representing Verna when he filed the application for guardianship on Jamie's behalf. Relying on Rule 1.02(g), Allen stated: "I stand here to tell the Court that it's my opinion I am doing what's in the best interest of Mrs. Thetford by representing Ms. Rogers in this application." At the conclusion of the 40-minute hearing, at which the court considered only counsel's arguments and the written statements of physicians Brown and Gilford, the court announced: "I'm going to deny the disqualification of counsel, but"—then speaking directly to Allen—"it's at your peril. If there's something brought under the disciplinary rules, someone else besides me is going to make a decision as to whether or not you violated that rule."

9

For the rest of that day and all of the next, the court heard evidence on Jamie's application for temporary guardianship. Jamie, Larry, Verna's stepson, and two Brookdale caregivers testified that Verna needed a guardian. Verna, Crawford, and Dalton testified that she did not. In her hour-long testimony, Verna was asked by both Aldrich and Allen about the details of various matters, and she was able to recall some details but not others. At the conclusion of the hearing, the court signed an order appointing Jamie as temporary guardian for Verna for 60 days on a $2,500 bond and appointing one of Verna's banks to manage her property. The order found:

2.      There is substantial evidence that [Mrs. Thetford] may be an incapacitated person;

3.      There exists an imminent danger that the physical health or safety of Mrs. Thetford will be seriously impaired and that Mrs. Thetford's estate will be seriously damaged or dissipated unless immediate action is taken;

4.      There is an immediate need for the appointment of a temporary guardian and the creation of a Management Trust;

5.      Alternatives to guardianship that would avoid the need for the appointment of a Temporary Guardian and the establishment of a Management Trust have been considered and determined not to be feasible;

*        *        *

9.      It is in the best interest of Mrs. Thetford that a temporary guardian of the person be appointed to promote and protect Mrs. Thetford's well-being;

10.     It is in the best interest of Mrs. Thetford that a Management Trust be established to protect and manage her estate;

11.     JAMIE KAY ROGERS is a suitable person to act as Temporary Guardian and is not disqualified by law from acting as such; and

12.     CIERA BANK is a suitable entity to act as Trustee of a Management Trust and is not disqualified by law from acting as such.

10

The order broadly gave Jamie "all powers" over Verna's person and removed Verna's right to travel, make gifts, drive a vehicle, and execute legal documents and contracts.

Verna sought review of the denial of the motion to disqualify by mandamus and appealed Jamie's appointment as her temporary guardian. The court of appeals denied mandamus relief with a summary opinion on June 15, and Verna petitioned for mandamus relief in this Court. We requested briefing.

On October 9, Verna was re-evaluated by C. Munro Cullum, Ph.D., Chief of the Division of Psychology at U.T. Southwestern Medical Center. He reviewed all Verna's medical records and Hilborn's examination of her, and while he agreed that Hilborn had thoroughly tested Verna, he disagreed with Hilborn's conclusions. Interviewing Verna himself, Cullum found her to be "engaging", "oriented to time, place, and person", and "able to walk unassisted", but with "significant visual limitations and hearing loss". He noted that she "expressed concerns about a 'conspiracy' of various people and public officials collaborating to remove her independence, and strongly expressed the opinion that she does not feel that she has any problems with her cognitive abilities or needs assistance with managing her affairs." But Cullum observed that "such expressions are not uncommon in individuals with dementia and reflect a lack of awareness/denial, as well as some suspiciousness or paranoid ideation." He concluded:

> Based upon my interviews with Ms. Thetford and others who know her, in addition to my review of medical records and neuropsychological data, it is clear that she meets full diagnostic criteria for dementia. She demonstrates a rather severe memory impairment as well as deficits in other cognitive abilities. A diagnosis of dementia is also consistent with the impression of her primary care physician who has known her for years, and is further supported by the results of Dr. Hilborn's neuropsychological evaluation which demonstrated significant impairments across

11

multiple cognitive ability areas, including learning and memory, language, attention, and global cognitive functioning. These findings are quite consistent with the reports of those who know her well, all of whom provided examples of her forgetting recent information and decisions she has made.

As with other individuals who are diagnosed with a neurodegenerative dementia, her condition is likely to worsen over time, and there are no effective treatments available that would significantly improve her functioning. In addition to dementia, she has significant visual and hearing impairments, which together make her functionally incapacitated and unable to provide for many of her basic needs and manage her affairs.

Activities like cooking, managing medications and finances, keeping up with bills, etc. are beyond her abilities at this point. As such, Ms. Thetford's cognitive and functional limitations would place her safety in question if she were to attempt to live and manage her affairs independently, and she is also at risk for making poor decisions and forgetting things that she has decided. It is therefore in her best interest that [sic] to have a permanent guardian to assist with management of her estate and personal needs.

Pending conclusion of the proceedings in this Court, the trial court extended Jamie's temporary guardianship and the management trust over Verna's estate without objection from Verna, and the court of appeals granted Verna's unopposed motion to abate her appeal. We heard argument on Verna's petition for mandamus on October 10, 2018.

On March 5, 2019, Jamie notified the trial court of a significant change in Verna's circumstances.

On February 28, 2019, caregivers at Elmcroft (formerly Brookdale), in Graham, Texas, telephoned [Jamie] to report that [Verna] was hallucinating about a fire and could not be calmed down or controlled. [Verna] was apparently seeing fires on the ceiling, on the floors, and on the walls of her room. She was attempting to physically stomp out the fire she believed she was seeing, and she was pouring water on the walls, floor, and electrical outlets. There was no fire.

Because [Verna] would not calm down, was fighting with personnel and the caregivers called to the scene, and her refusal to take medicine voluntarily, Elmcroft

12

personnel called 911. [Verna] refused to allow the EMT's to transport her to the Graham Emergency Room or to voluntarily take medication, so a sedative was administered at the instruction of [Jamie], and [Verna] was transferred to the Graham Emergency Room.

Deeming Verna to be a danger to herself and others, Elmcroft refused to readmit her. Several days later, Jamie managed to have Verna accepted at the James L. West Center for Dementia Care in Fort Worth. Jamie paid some $11,000 of the transfer expenses out of her own pocket and requested the trial court to allow reimbursement from Verna's estate. Over the course of the trial and appellate proceedings, Allen and Jamie's appellate counsel have been paid over $200,000 in attorney fees from Verna's estate. Reddell, Verna's attorney ad litem, has been paid almost $9,000 in attorney fees from the estate. Aldrich has requested payment of over $230,000 of attorney fees from the estate, which the trial court has denied.

By letter dated March 15, 2019, Reddell reported to the trial court that he had spoken with Verna at the James L. West Center; that she "was unwavering" in her intention to move back to her home in Graham or to move in with Dalton and his wife; but that the Center, "a polished facility," and Jamie were providing Verna everything she needed. "I firmly believe," Reddell concluded, "that this facility is where Mrs. Thetford needs to be."

**II**

Allen argues here, as he did in the trial court, that Rule 1.02(g) required him, as Verna's lawyer at the time, to institute guardianship proceedings for her by also representing the applicant, Jamie. Verna contends that Rule 1.02(g) does not apply because "the record reflects that [she] was

not Allen's client in 2017"[8] and that Allen's representation of Jamie is a conflict of interest under Rule 1.09(a)(3), which states: "Without prior consent, a lawyer who personally has formerly represented a client in a matter shall not thereafter represent another person in a matter adverse to the former client: . . . (3) if it is the same or a substantially related matter." Alternatively, Verna argues, as she did in the trial court, that "if [she were] Allen's client in 2017, and Rule 1.02(g) [did]

[8] Relator's Reply Br. 1. Verna appears to have taken the opposite position in the trial court, asserting that Allen had judicially admitted that he represented her at the time the application for guardianship was filed, and arguing not that Rule 1.02(g) was inapplicable, but that Allen's actions were not reasonable as required by the rule. In this Court, Verna argues that Allen should have been disqualified whether she was his client in 2017 or not because she is unquestionably his former client. *See* Relator's Br. 13 & n.4 ("Allen's representation of Rogers is substantially related to his prior—or concurrent—representation of Thetford.").

The dissent claims that "Thetford maintains Allen is still her attorney." *Post* at ___. The dissent's only support for this assertion is that "Thetford has continually argued to this Court that Rule 1.06—regarding current client conflict of interest—applies." But Verna also states clearly in her briefs that she is Allen's former client. *See* Relators Br. 9 ("Allen's representation of Rogers in this guardianship proceeding is adverse to Thetford, Allen's former client"); *id.* at 27 ("Allen's representation of Rogers in this guardianship proceeding is adverse to Thetford and substantially related to Allen's prior representation of Thetford."); Relator's Reply Br. 1 ("[T]he record reflects that Thetford was not Allen's client in 2017; rather, Thetford had hired another attorney to revoke the power of attorney, which led to the guardianship proceeding."). Further, the dissent claims that "Allen seems to agree [that he still represents Verna], stating at oral argument to this Court that 'I really do view it that I'm representing Mrs. Thetford.'" *Post* at ___. But that statement is not so clear in context:

Justice: Are you, as counsel who has filed the application for the guardianship—have you taken the position in the guardianship that Ms. Rogers should be the one appointed as guardian and only Ms. Rogers?

Allen: I've taken that position because that is what Mrs. Thetford told me in 2015 . . . when she had capacity.

Justice: [W]ho is the client on whose behalf you are taking that position?

Allen: I view it, I really do view it that I'm representing Mrs. Thetford. Mrs. Thetford needs a guardian.

Though the last question is asked and answered in the present tense, both may refer back to the time the application was filed and not subsequently. In any event, Jamie, represented by Allen, has not asserted in any brief filed here that Allen has represented Verna at any time since she filed a response to the application, represented by other counsel.

apply to this case, then Allen ran afoul of Rule 1.06(a)"[9] or 1.06(b).[10] We begin by considering the interplay of Rules 1.02(g), 1.06(a)–(b), and 1.09(a)(3).

Rule 1.02(g) requires a lawyer to "take reasonable action to secure the appointment of a guardian or other legal representative for, or seek other protective orders with respect to, a client whenever the lawyer reasonably believes that the client lacks legal competence and that such action should be taken to protect the client." The comments to the rule add that a lawyer should take these protective steps "when it reasonably appears advisable to do so in order to serve the client's best interests."[11] At least one court of appeals has concluded that Rule 1.02 requires a lawyer to file an application for guardianship on behalf of an incapacitated client when the lawyer reasonably believes guardianship is needed.[12]

But while Rule 1.02(g) requires an attorney to take "reasonable action" to protect a client, which may include appointment of a guardian, the rule does not mandate a guardianship. There may be other, better ways to protect the client. Allen, for example, could have notified the trial court of Verna's potential incapacity and the need for a guardian, which the court would have been required to investigate.[13] He also could have pursued one of the numerous less-restrictive alternatives to

---

[9] Relator's Reply Br. 1.

[10] Relator's Br. 5–6.

[11] R. 1.02 cmt. 13.

[12] *See Franks v. Roades*, 310 S.W.3d 615, 627 (Tex. App.—Corpus Christi 2010, no pet.) (when an attorney who reasonably believed his client was incompetent "filed the application [for guardianship], he was acting under [Rule 1.02(g)], which required him to seek the guardianship").

[13] *See* TEX. EST. CODE § 1102.001(a).

15

guardianship.[14] And even if Allen believed guardianship were necessary, he could have helped Jamie find another attorney. Rule 1.02's requirement that an attorney take "reasonable action" to protect a client expressly *allows*, but does not also *require*, the attorney to institute a guardianship proceeding.

Verna argues that Rule 1.02(g) does not apply because she was not Allen's client in 2017 and that his representation of Jamie was a conflict of interest in violation of Rule 1.09. Even if Rule 1.02(g) did apply, Verna contends, it would not allow a conflict of interest that Rule 1.06(a) or (b) prohibits. We need not decide whether Verna was still Allen's client or his former client when he undertook to represent Jamie or whether Rule 1.02(g) applies. Even if it did, it did not mandate that Allen initiate the guardianship but must be read together with the conflict-of-interest rules to determine whether filing the application for Jamie was "reasonable action". Rule 1.02(g) does not trump the conflict-of-interest rules.

### III

Rules 1.06(b) and 1.09(a)(3) forbid a lawyer from taking on a representation that is adverse to a current or former client in a substantially related matter. Although the rules do not have the force of law, they "provide guidelines and suggest relevant considerations."[15] We have repeatedly said that lawyers who violate the conflict-of-interest rules must be disqualified because there is an irrebuttable presumption that a lawyer obtains a client's confidential information during

---

[14] *See* TEX. EST. CODE § 1002.0015 (laying out nine alternatives less restrictive than a guardianship).

[15] *In re EPIC Holdings, Inc.*, 985 S.W.2d 41, 48 (Tex. 1998) (quoting *Nat'l Med. Enters., Inc. v. Godbey*, 924 S.W.2d 123, 132 (Tex. 1996)); *accord Henderson v. Floyd*, 891 S.W.2d 252, 254 (Tex. 1995) (orig. proceeding) (per curiam) ("Rule 1.09 cannot be an absolute test for disqualification of counsel".).

representation.[16] Although the attorney will not be presumed to have shared that information with his current client, the "appearance of impropriety" demands that the trial court disqualify counsel.[17]

Lawyer disqualification is "a severe remedy"[18] that "can result in immediate and palpable harm, disrupt trial court proceedings, and deprive a party of the right to have counsel of choice."[19] In a guardianship proceeding, the harm may be even greater. A lawyer who was familiar with the ward's needs and desires before she became incapacitated is potentially helpful to the trial court. Accordingly, a trial court evaluating a disqualification motion "must strictly adhere to an exacting standard".[20] A party moving for disqualification based on a violation of a disciplinary rule must "establish with specificity" that the disciplinary rule was violated.[21] We review a trial court's refusal to disqualify a lawyer for abuse of discretion.[22] "A trial court abuses its discretion when it acts in

---

[16] *See In re Columbia Valley Healthcare Sys., L.P.*, 320 S.W.3d 819, 824 (Tex. 2010) (orig. proceeding) (citing *Phx. Founders, Inc. v. Marshall*, 887 S.W.2d 831, 833 (Tex. 1994)); *NCNB Tex. Nat'l Bank v. Coker*, 765 S.W.2d 398, 400 (Tex. 1989). We have been unclear about when the conclusive presumption that the lawyer obtained confidential information in lawyer disqualification cases attaches. In *Coker*, we said that for the presumption to attach, the movant must establish that the current matter is substantially related to the former representation. 765 S.W.2d at 400 ("If this burden [of showing substantial relation] can be met, the moving party is entitled to a conclusive presumption that confidences and secrets were imparted to the former attorney."). But in later cases, we eschewed the condition of showing substantial relation. *See Phx. Founders*, 887 S.W.2d at 833 ("This strict [disqualification] rule is based on a conclusive presumption that confidences and secrets were imparted to the attorney during the prior representation."); *Columbia Valley Healthcare Sys.*, 320 S.W.3d at 824 ("If the lawyer works on a matter, there is an irrebuttable presumption that the lawyer obtained confidential information during representation."). The newer, broader rule is the better rule, and we reaffirm it here.

[17] *Coker*, 765 S.W.2d at 400.

[18] *Spears v. Fourth Court of Appeals*, 797 S.W.2d 654, 656 (Tex. 1990) (orig. proceeding) (citing *Coker*, 765 S.W.2d at 400).

[19] *In re Nitla S.A. de C.V.*, 92 S.W.3d 419, 422 (Tex. 2002) (orig. proceeding) (per curiam).

[20] *Id.* (citing *Spears*, 797 S.W.2d at 656).

[21] *Spears*, 797 S.W.2d at 656 (citing *Coker*, 765 S.W.2d at 400).

[22] *In re Turner*, 542 S.W.3d 553, 555 (Tex. 2017) (orig. proceeding) (per curiam).

an unreasonable or arbitrary manner or, stated differently, when it acts without any reference to guiding rules or principles."[23]

The conflict-of-interest standards under Rules 1.06(b) and 1.09(a)(3) are materially the same in the circumstances presented. To prevail in having Allen disqualified, Verna must show that (1) Allen's representations of her are substantially related to the matters in the guardianship proceeding, and (2) the guardianship proceeding is adverse to her. We consider each prong in turn.

**A**

We first turn to whether Allen's representations of Verna—drafting her will and the power of attorney[24]—are substantially related to the guardianship proceeding. The rules do not define "substantially related." According to the comments, "it primarily involves situations where a lawyer could have acquired confidential information concerning a prior client that could be used either to that prior client's disadvantage or for the advantage of the lawyer's current client or some other person."[25] We have held that matters are substantially related when the similarity of the facts involved "creates a genuine threat that confidences revealed to [the client's] former counsel will be divulged to his present adversary."[26] Neither conclusory statements of similarities nor facial similarities will suffice—the movant must delineate specific facts that tie the former and current

---

[23] *In re Meador*, 968 S.W.2d 346, 353 (Tex. 1998) (orig. proceeding).

[24] Verna also states in her brief that Allen's prior representation of her in the loan transaction between the Rogerses and the Thetfords is substantially related to the issues in the guardianship proceeding, but then she does not argue the point. Because the note is clearly unrelated to the guardianship proceeding, we do not address it.

[25] R. 1.09 cmt. 4B.

[26] *Coker*, 765 S.W.2d at 400.

18

representations together.[27] But while producing specific overlapping facts is necessary to show substantial relation, it is not sufficient. The test is whether those facts create "a genuine threat of disclosure."[28]

We must presume, as a matter of law, that Verna shared confidences with Allen related to her estate planning and possible future incapacity when he prepared her will and power of attorney.[29] But whatever she may have told Allen confidentially in the course of his representation of her that is reflected in the instruments he prepared is open knowledge. She attached both as exhibits to her pleadings in the trial court. There can be no threat of disclosure of confidences that the movant has already revealed to her adversary.[30]

Verna claims that she shared confidential information "regarding the nature of the estate and [her] intention with regard to her estate's disposition" that "goes beyond the four corners of her will." It is hard to imagine how her intention for disposing of her estate would not be directly reflected in the will itself, for that is its very purpose. But even assuming such confidences exist, Verna has not shown how they are substantially related to the guardianship proceeding, the purpose of which is to determine whether Verna is currently incapacitated. Verna's petition only points to

---

[27] *See id.*; *see also J.K. & Susie L. Wadley Research Inst. & Blood Bank v. Morris*, 776 S.W.2d 271, 278 (Tex. App.—Dallas 1989, orig. proceeding) ("A superficial resemblance between issues is not enough to constitute a substantial relationship . . . .").

[28] *In re Turner*, 542 S.W.3d 553, 557 (Tex. 2017) (orig. proceeding) (per curiam) (emphasis omitted) (quoting *Grant v. Thirteenth Court of Appeals*, 888 S.W.2d 466, 467 (Tex. 1994) (orig. proceeding) (per curiam)).

[29] *See In re Columbia Valley Healthcare Sys., L.P.*, 320 S.W.3d 819, 824 (Tex. 2010) (orig. proceeding).

[30] *See Metro. Life Ins. Co. v. Syntek Fin. Corp.*, 881 S.W.2d 319, 321 (Tex. 1994) (per curiam) (affirming trial court's denial of disqualification where the confidential information at issue was publicly available and had been provided by the movant to the opposing party during discovery).

facial similarities between the representations. Estate planning and guardianship are similar in that they are both end-of-life matters. But that is the very sort of superficial comparison that cannot govern lawyer disqualification. The test is whether that similarity creates a genuine threat that Allen will reveal Verna's confidences to Jamie, and there is not because any possible remaining confidences to which Verna has alluded are irrelevant to the guardianship proceeding.[31]

Because Verna has not shown that Allen's prior representations of her create a genuine risk that he will reveal her confidences to Jamie, we find that they are not "substantially related" to the underlying guardianship proceeding.[32]

**B**

Next we consider whether Allen's representation of Jamie in the guardianship proceeding, without Verna's consent, is adverse to Verna. We have held that in the context of lawyer disqualification, "[a]dversity . . . is a product of the likelihood of the risk [that a lawsuit poses to a

---

[31] The dissent argues repeatedly that in representing Jamie, Allen may "draw[] on his knowledge and experience of Thetford's mental capacity". *Post* at ___. "[T]here is no telling what information Thetford might have candidly shared concerning her mental state that informed her estate-planning decisions." *Post* at ___. The dissent supposes that "[t]he most intimate confidences a client might convey to her attorney is her awareness that her mental capacity is beginning to slip and her request that an attorney help her plan for a future in which she can no longer care for herself." *Post* at ___. But nothing in this record remotely suggests that Verna began to "slip" until a year after she executed her will and power of attorney. All Allen knew in preparing those instruments for her was that she was completely sound; otherwise he would not have represented her. Verna carries the burden of showing that there is a genuine threat that her confidences will be revealed, and she has not met her burden. She did not make the arguments the dissent makes; the closest she comes is asserting that Allen was "a witness to [her] legal capacity in 2015". Relator's Br. 14. That is not enough.

[32] The proceedings in the trial court since its ruling on the motion to disqualify establish unquestionably that Allen could not have had confidential information from his estate-planning representation of Verna that was in any way related to the guardianship, demonstrating that disqualification must not be based on speculation and conclusory statements but on specific facts.

person's interests] and the seriousness of its consequences."[33] While Rule 1.09 does not define adversity, the comments to Rule 1.06 define "directly adverse" as follows:

> Within the meaning of Rule 1.06(b), the representation of one client is "directly adverse" to the representation of another client if the lawyer's independent judgment on behalf of a client or the lawyer's ability or willingness to consider, recommend or carry out a course of action will be or is reasonably likely to be adversely affected by the lawyer's representation of, or responsibilities to, the other client. The dual representation also is directly adverse if the lawyer reasonably appears to be called upon to espouse adverse positions in the same matter or a related matter.[34]

> Rule 1.06(a) prohibits a lawyer from "represent[ing] opposing parties to the same litigation."

The comments to the rule shed more light on the concept of adversity:

> The term "opposing parties" as used in this Rule contemplates a situation where a judgment favorable to one of the parties will directly impact unfavorably upon the other party. Moreover, as a general proposition loyalty to a client prohibits undertaking representation directly adverse to the representation of that client in a substantially related matter unless that client's fully informed consent is obtained and unless the lawyer reasonably believes that the lawyer's representation will be reasonably protective of that client's interests.[35]

As the comment indicates, Rule 1.06(a) incorporates the conflict-of-interest concept in Rule 1.06(b).[36] In short, our precedent and the rules contemplate that a proceeding is adverse to a person if it poses a risk to their interests—if a judgment favorable to another party would harm that person's

---

[33] *In re EPIC Holdings, Inc.*, 985 S.W.2d 41, 50 (Tex. 1998) (orig. proceeding) (second alteration in original) (quoting *Nat'l Med. Enters., Inc. v. Godbey*, 924 S.W.2d 123, 132 (Tex. 1996)).

[34] R. 1.06 cmt. 6. We have approved using this definition as guidance in interpreting the meaning of "adverse" in Rule 1.09. *Nat'l Med. Enters.*, 924 S.W.2d at 132 ("Rule 1.09 does not define 'adverse', so the district court turned, correctly, we think, to the dictionary definition of the word, and to the definition of 'directly adverse' in Rule 1.06, comment 6.").

[35] R. 1.06 cmt. 2.

[36] Of course, as noted above, Allen has not purported to represent Verna since filing the application for Jamie.

21

interests. And a lawyer's representation of one client is adverse to another client if the lawyer's ability to faithfully and loyally represent his other client is compromised.

Generally, "[p]roceedings for the appointment of a guardian are not adversary in character."[37] They are designed to "promote and protect the well-being of the incapacitated person."[38] An appointment of a guardian may not impact a ward unfavorably but instead be in the ward's best interests. Indeed, Rule 1.02(g) expressly permits a lawyer to "secure the appointment of a guardian" for his client when "reasonable" to assure the client's well-being. Nevertheless, guardianship strips the ward of fundamental rights, a severe consequence if guardianship is unwarranted, so that even a slight risk posed to the proposed ward's interests may be sufficient to create adversity.[39] And the rules are silent as to whether the lawyer of an incapacitated client may represent a third party seeking guardianship over his client.

We have not addressed under what conditions a guardianship could be adverse to the ward, but the American Bar Association (ABA), the American Law Institute (ALI), and other jurisdictions have. We first consider these nonbinding but persuasive authorities and propose a general rule, which we then apply to the facts at hand.

---

[37] *Henderson v. Shell Oil Co.*, 202 S.W.2d 492, 497 (Tex. App.—Fort Worth 1947), *aff'd*, 208 S.W.2d 863 (Tex. 1948); *accord Franks v. Roades*, 310 S.W.3d 615, 627 (Tex. App.—Corpus Christi 2010, no pet.) ("Guardianships are not inherently adversarial proceedings; thus, the applicant is not automatically adverse to the ward."); *McKinley v. Salter*, 136 S.W.2d 615, 624 (Tex. App.—El Paso 1939, writ dism'd judgm't cor.) ("Proceedings for the appointment of a guardian are not adversary in their nature."), *appeal dism'd*, 312 U.S. 659 (1941) .

[38] TEX. EST. CODE § 1001.001(a).

[39] *See Nat'l Med. Enters.*, 924 S.W.2d at 133 (holding that a matter was adverse to movant for lawyer disqualification where risk of movant being negatively affected by the representation was small, but the consequences would be great).

22

ABA Model Rule 1.14(b) states:

> When the lawyer reasonably believes that the client has diminished capacity, is at risk of substantial physical, financial or other harm unless action is taken and cannot adequately act in the client's own interest, the lawyer may take reasonably necessary protective action, including consulting with individuals or entities that have the ability to take action to protect the client and, in appropriate cases, seeking the appointment of a guardian ad litem, conservator or guardian.[40]

The rule is substantially the same as Texas Rule 1.02(g). In a 1994 opinion, the ABA's Commission on Ethics and Professional Responsibility reasoned that filing a petition for guardianship "by its very nature must be regarded as 'adverse' to the client" because it "will take away the client's fundamental right of independence."[41] The Commission concluded that Rule 1.14's permission for a lawyer to file a petition for guardianship on behalf of an incapacitated client is a "narrow exception" to the conflict-of-interest rules.[42] Because the rule does not expressly permit a lawyer to represent a third party seeking to have a guardian appointed for his client, "[s]uch a representation would necessarily have to be regarded as 'adverse' to the client and prohibited by [the conflict-of-interest rule], even if the lawyer sincerely and reasonably believes that such representation would be in the client's best interests, unless and until the court makes the necessary determination of incompetence."[43] "[N]othing in the rule suggests that the lawyer may represent a third party in taking such action, and after considerable analysis, the Committee concludes that a lawyer with a disabled

---

[40] MODEL RULES OF PROF'L CONDUCT r. 1.14(b) (AM. BAR. ASS'N 1983).

[41] *Id.*

[42] ABA Comm'n on Ethics & Prof'l Responsibility, Formal Op. 96-404, at 7 (1996).

[43] *Id.*

client should not attempt to represent a third party petitioning for a guardianship over the lawyer's client."[44]

The obvious problem with the ABA opinion is that it is not founded on the text of Model Rule 1.14, which broadly allows a lawyer to "take reasonably necessary protective action, including . . . seeking the appointment of . . . a guardian." The opinion justifies its extremely narrow reading of the rule by arguing that guardianships are always adverse. But the ABA provides scant justification for this sweeping declaration—only that a guardianship takes away the ward's fundamental rights. The ABA also prioritizes the conflict-of-interest rules over the lawyer's judgment about what's in the best interests of the client, going as far as to prohibit the lawyer from representing a third party seeking guardianship over his client even if he reasonably believes it would be in the client's best interests. But if a lawyer's pursuit of a guardianship on behalf of a client should be so strictly limited—regardless of the ward's best interests—then Model Rule 1.14 should so state.

The rule requiring reasonable action to protect an incapacitated client should be read *together with* conflict-of-interest rules and not as an inconsistent exception. This is what the ALI's *Restatement (Third) of the Law Governing Lawyers* does. Section 24A provides, in part, that a lawyer representing a client with diminished capacity must act in the best interests of the client by "pursu[ing] the lawyer's reasonable view of the client's objectives or interests as the client would define them if able to make adequately considered decisions on the matter, even if the client

---

[44] *Id.*

24

expresses no wishes or gives contrary instructions."[45] Like the ABA's model rule and the Texas rule, the *Restatement* permits a lawyer to seek a guardian for a client "when doing so is practical and will advance the client's objectives or interests."[46] The comments expand upon the rationale for this flexible rule: "[A] lawyer must often exercise an informed professional judgment in choosing among . . . imperfect alternatives".[47] And "[i]n some cases, different views about the client's welfare may be presented by opposing counsel for a tribunal decision."[48] Although the *Restatement* does not directly address adversity, it gives a lawyer wide latitude to act in his client's best interests—including bringing a guardianship proceeding against the client's instructions in her incapacitated state, even against opposing counsel—and implies that such actions are not adverse to the client.

Courts or ethics advisory committees in several states have considered this issue. Most, like the ABA, have concluded that guardianship petitions are inherently adverse, and so an incapacitated client's lawyer may initiate a guardianship but may not represent a prospective guardian.[49] Others have held or opined that an incapacitated client's lawyer may not represent a third party seeking

---

[45] RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 24A (AM. LAW INST. 2000).

[46] *Id.*

[47] *Id.* cmt. b.

[48] *Id.*

[49] *Att'y Grievance Comm'n of Maryland v. Framm*, 144 A.3d 827, 848 (Md. 2016); *Dayton Bar Ass'n v. Parisi*, 965 N.E.2d 268, 274 (Ohio 2012); *In re Wyatt's Case*, 982 A.2d 396, 410 (N.H. 2009); *In re Discipline of Laprath*, 670 N.W.2d 41, 58 (S.D. 2003); Colo. Bar Ass'n Ethics Comm., Formal Ethics Op. 126 (May 6, 2015); Utah State Bar Ethics Advisory Op. Comm., Op. 08-02, 2008 WL 2110963 (Mar. 11, 2008); S.C. Bar Ethics Advisory Comm., Ethics Advisory Op. 05-11, 2005 WL 1704509 (July 15, 2005); Va. State Bar, Va. Legal Ethics Op. 1769, 2002 WL 31999376 (Feb. 10, 2003).

guardianship over his client where the incapacitated client opposes the guardianship or the guardianship would be against the client's interests.[50] At least one has concluded that it is permissible for an incapacitated client's lawyer to represent a third party seeking guardianship in some circumstances.[51]

We find the *Restatement*'s approach the most compelling. Rather than a bright-line rule, its flexible approach better accommodates the challenges lawyers, families, and trial courts face when trying to best protect the incapacitated elderly. We would hold that for a guardianship proceeding to be adverse, the applicant's interests must be adverse to the proposed ward's objectives or interests as the proposed ward would have defined them when she had capacity. In the absence of evidence of how the proposed ward would have defined her interests, we think adversity exists when the applicant's interests would not promote and protect the proposed ward's well-being.[52] It follows that

---

[50] *In re Stein*, 177 P.3d 513, 520 (N.M. 2008) (holding that it was a conflict of interest for a lawyer to represent both an incapacitated husband and his wife seeking to be his guardian where the wife simultaneously sought control over her husband's finances in federal court, showing her adverse interest in the outcome of the guardianship proceeding); N.Y. State Bar Ass'n Comm. Prof'l Ethics, Op. 986, 2013 WL 11324019 (Oct. 25, 2013) (concluding that a lawyer could not represent a client's sister petitioning for guardianship for the client when the sister's plans conflicted with the client's stated wishes for living arrangements); Mass. Bar Ass'n Comm. Prof'l Ethics, Op. 05-05 (May 2005) (opining that a lawyer may not represent a client's son in seeking guardianship for the client if the client contests the guardianship); State Bar of Mich. Eth. Op. RI-176 (Oct. 29, 1993) (reasoning that a lawyer may not represent both a mother and her daughter in guardianship proceedings for mother, even with the mother's consent, when their interests were adverse because the mother had formerly opposed guardianship); Wash. State Bar Ass'n, Advisory Op. 980 (1986) (reasoning that a lawyer who represented a husband and wife could not represent the wife in petition for guardianship for the husband "if the lawyer were aware of an actual conflict of interest or the use of confidences or secrets").

[51] R.I. Supreme Court Ethics Advisory Panel Op. 2004-1 (2004) (opining that it is not a conflict of interest for a lawyer to represent a third party petitioning for guardianship over lawyer's elderly client when the lawyer reasonably believes guardianship is in the client's best interests).

[52] *See Betts v. Brown*, No. 14-99-00619-CV, 2001 WL 40337, at *4 (Tex. App.—Houston [14th Dist.] Jan. 18, 2001, no pet.) ("[A]n interest is adverse to a proposed ward under [the predecessor to Texas Estates Code section 1055.00]", which governs standing to commence or contest a guardianship proceeding, "when that interest does not promote the well-being of the ward.").

a lawyer may represent a third party seeking guardianship over his incapacitated client if the lawyer reasonably believes the representation is in his client's best interests as the client would have defined it when she had capacity.[53]

**2**

For this guardianship proceeding to be adverse to Verna, Jamie's interests would have to be adverse to Verna's interests as seen by Verna before she became incapacitated. Here, we have direct evidence of what those interests are: the power of attorney shows that before her dementia worsened, Verna wanted Jamie to serve as her guardian if the need ever arose. Verna counters that she currently opposes the guardianship, but this does not, by itself, create adversity. Proposed wards often believe, mistakenly, that they do not need a guardian.[54]

Further, nothing in the record indicates that Jamie has interests adverse to Verna's well-being. Verna makes much of the fact that Jamie was indebted to the Thetfords at the time Jamie applied for guardianship. But Jamie fully paid off the note before any hearings and before her appointment as temporary guardian, and the Estates Code expressly permits a person who was

---

[53] The dissent agrees that "not all guardianship proceedings are inherently adverse" but argues that "a guardianship proceeding in which the proposed ward contests the guardianship *is* inherently adverse." *Post* at ___. But the flaw in the argument is that the proposed ward may lack the capacity to contest the proceeding, despite trying to do so. That is what the trial court determined here. The dissent argues that this proceeding is adverse because a guardian is not what "Thetford wants", but what she says she wants cannot determine adversity if she is incapacitated. The dissent states that "whether the guardianship proceeding is adverse for disqualification purposes should not turn on whether the guardianship is ultimately warranted." *Post* at ___. We agree, but the likelihood that incapacity will be shown is something the trial court should consider.

[54] *See, e.g.*, *Henderson v. Shell Oil Co.*, 202 S.W.2d 492, 497 (Tex. App.—Fort Worth 1947), *aff'd*, 208 S.W.2d 863 (Tex. 1948); *Franks v. Roades*, 310 S.W.3d 615, 627 (Tex. App.—Corpus Christi 2010, no pet.). In his statement about Verna's mental state, Dr. Cullum noted that while Verna expressed a strong opinion that she does not have cognitive disabilities or need assistance with managing her affairs, "such expressions are not uncommon in individuals with dementia and reflect a lack of awareness/denial."

formerly indebted to the proposed ward to be appointed as guardian.[55] A prior debt creates no present adverse interest for purposes of Rules 1.06 and 1.09. Moreover, that Jamie stands to inherit under Verna's will does not create adversity because when Verna still possessed all of her faculties, she executed a will documenting her clear objective that Jamie be a beneficiary.

We would also hold that Allen's representation of Jamie in the guardianship proceeding is not adverse to Verna. There are myriad ways one seeking guardianship could have interests opposed to that of the proposed ward. For example, had Jamie continued to be indebted to the Thetfords throughout the proceeding, her pecuniary interests would clearly be adverse to Verna's (and she would be statutorily barred from serving as guardian[56]). Or had Verna designated another person as her preferred guardian in the power of attorney or another legal document, and that person were willing and able to serve as guardian, Allen's representation of Jamie would be adverse to Verna. In most cases, the proposed ward likely will not have clearly spelled out her preferences as Verna did here. The trial court is in the best position to evaluate the facts and circumstances to determine whether adversity exists. Here, there is none.

---

[55] *See* TEX. EST. CODE § 1104.354 ("A person may not be appointed guardian if that person: . . . (2) is indebted to the proposed ward, *unless* the person pays the debt before appointment . . . ." (emphasis added)); *see also In re Guardianship of Miller*, 299 S.W.3d 179, 189 (Tex. App.—Dallas 2009, no pet.) (en banc) (an applicant's debt to ward does not create an adverse interest divesting the debtor of standing to file a guardianship because Estates Code section 1104.354 allows appointment once the debt is paid).

[56] *See* TEX. EST. CODE § 1104.354.

## IV

In guardianship proceedings especially, the heavy responsibility for determining the best resolution of fundamental and emotional issues lies necessarily within the trial court's sound discretion. The State's power is invoked to confiscate the putative ward's constitutional rights to liberty and property, and often even to life, and transfer them to another. It is serious business. And it is a difficult and emotional process that confronts the hardest end-of-life issues. The stakes are high: the guardian has the potential to protect, even save, the ward who is powerless to save herself—but also, tragically, to neglect, abuse, and exploit her. Family and friends may be in the best position to know and fulfill the ward's needs, or sadly, in the worst. An appellate court's review of a trial court's management of guardianship proceedings must be singularly mindful of the trial court's unique opportunity and responsibility to assess the circumstances presented.

The record reflects that the trial court was well aware of the issues, considered them thoughtfully, and made a careful decision. And it is not final. The court can revisit the issue, change its mind later, and disqualify counsel at a later stage if other information comes to light. A trial court's discretion has limits, of course, and the threshold for abuse, when a decision must be reversed, may rise or fall in different situations. In the situation before us, we will not disturb the trial court's discretion in this guardianship proceeding.

The petition for mandamus is denied.

_____
Nathan L. Hecht
Chief Justice

Opinion delivered: May 24, 2019

29