Opinion issued May 11, 2023



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-22-00188-CV

_____

## IN RE MAURICIO GUTIERREZ AND NRG ENERGY, INC., Relators

---

### Original Proceeding on Petition for Writ of Mandamus

---

\* \* \*

_____

## NO. 01-22-00190-CV

_____

## IN RE ISSUANCE OF SUBPOENA FOR THE DEPOSITION OF MAURICIO GUTIERREZ

---

On Appeal from the 152nd District Court
Harris County, Texas
Trial Court Case No. 2022-01400

---

## MEMORANDUM OPINION

A Louisiana court issued a letter rogatory asking a Harris County court to issue a subpoena for the deposition of Mauricio Gutierrez, a Texas resident and CEO of NRG Energy, Inc. The parties seeking to depose Gutierrez—Washington-St. Tammany Electric Cooperative, Inc. (WST) and Claiborne Electric Cooperative, Inc. (Claiborne) (collectively, the Co-ops)—petitioned the Harris County trial court to issue the subpoena. Gutierrez and NRG opposed the petition and sought a protective order preventing the deposition. The trial court signed a discovery order denying Gutierrez and NRG's motion for protection and compelling the deposition. Gutierrez and NRG have challenged the trial court's discovery order in an appeal and in a petition for writ of mandamus, contending the trial court abused its discretion because (1) Texas's apex-deposition rule prevents the district court from enforcing the Louisiana letter rogatory, and (2) the Co-ops' Texas counsel should have been disqualified based on an imputed conflict of interest.

Because we conclude these issues may be decided by appeal, we deny the mandamus petition. In the appeal, we affirm the district court's order.

## Background

### *The Louisiana lawsuit* [1]

WST and Claiborne are member-owned electric cooperative corporations and plaintiffs in a Louisiana breach-of-contract lawsuit against LaGen. In their Louisiana lawsuit, the Co-ops allege that LaGen owns and operates electric power generation and transmission facilities in Louisiana, including the Big Cajun II power generating plant in Pointe Coupee Parish, and supplies them with power under contracts executed in 2002 and amended in 2011, as to Claiborne, and in 2012, as to Washington-St. Tammany. LaGen was a subsidiary of NRG when the power supply contracts in the Louisiana lawsuit were executed. NRG sold LaGen in 2019.

At issue are the power supply contracts' clause allocating the costs of complying with changes in environmental law. According to the Co-ops, the environmental law clause provides that the Co-ops are responsible only for a share of the "additional costs of complying" with post-contract changes in environmental laws and not for any costs to remediate pre-contract environmental conditions or any

---

[1]     Our recitation of facts here is based on the Co-ops' Louisiana petition, which is pending as *Washington-St. Tammany Electric Cooperative, Inc. and Claiborne Electric Cooperative, Inc. v. Louisiana Generating, L.L.C.*, No. C-695287, Division 25, in the 19th Judicial District Court for the Parish of East Baton Rouge, Louisiana. The Co-ops previously sued LaGen in federal court in Baton Rouge, but the court dismissed that suit for want of federal subject-matter jurisdiction. The Co-ops refiled in the Louisiana state court.

penalties or costs resulting from violations of any environmental law. In their view, LaGen is exclusively responsible for those costs.

The Louisiana petition states that three units at the Big Cajun II power generating plant "became operational in the early 1980s" and "were constructed to use coal as a fuel source." In 2009, the United States Environmental Protection Agency filed an enforcement action against LaGen under the Clean Air Act, alleging that unpermitted modifications to the Big Cajun II power generating plant in 1998 and 1999 increased the net emission of air pollutants. According to the Co-ops, the enforcement action resolved through a consent decree in 2012 (Consent Decree), which required LaGen to implement measures to reduce and control emissions of nitrogen oxides (NOx), sulfur dioxide ($SO_2$), and particulate matter (PM). The petition alleges that LaGen agreed in the Consent Decree to:

- implement a selective non-catalytic reduction system to reduce and control NOx emissions;

- "refuel (that is, convert from coal to natural gas) Big Cajun Unit 2" to reduce and control $SO_2$ emissions; and

- "continuously operate electrostatic precipitators ('ESPs')" and "start operating PM continuous emission monitoring systems ('CEMs')" at Big Cajun Units 1 and 3 to reduce and control PM emissions.

One of the Consent Decree's recitals states that "a portion of the emissions technology, including related to PM emissions and refueling, under th[e] [C]onsent [D]ecree, will allow [LaGen] to comply with the Mercury Air Toxics Rule [sic], a

4

change in environmental law promulgated after the filing of the [EPA's] complaint." The Co-ops contend that this recital references a Mercury and Air Toxic Standards (MATS Rule) that was promulgated by the EPA and became effective in 2012, during the enforcement action, and which, among other things, "required a reduction in certain toxic air pollutants from existing coal-fired power plants like those owned by LaGen." According to the Co-ops, LaGen used the recital to "re-characterize tens of millions of dollars in Consent Decree costs as related to the 2012 [MATS Rule]." For instance, the Co-ops allege that LaGen has identified, among other things, the cost of a boiler conversion from coal to natural gas at Unit 2, ESP upgrades at Units 1 and 3, and the CEMs for Units 1 and 3 as MATS Rule costs even though those emission controls were required by the Consent Decree. And they allege that LaGen breached the power supply contracts by improperly passing on these costs to comply with the Consent Decree, and others, as costs related to the MATS Rule. The Co-ops also seek declarations on these matters.

The Co-ops asserted in the Louisiana court that although they have taken 20 depositions in connection with their claims against LaGen, they require the deposition of Gutierrez, who is now NRG's chief executive officer. Neither Gutierrez nor NRG is a party to the Louisiana lawsuit or the power supply contracts.[2]

---

[2] It is undisputed that NRG agreed, as part of the sale of LaGen, to indemnify a subset of losses arising from the Louisiana lawsuit.

5

But the Co-ops allege that at the relevant times LaGen was an NRG subsidiary and Gutierrez, then serving as NRG's chief operating officer, approved the Consent Decree. Because Gutierrez is a Texas resident, and therefore outside the subpoena range, the Co-ops obtained a letter rogatory from the Louisiana court, which requested that a Harris County district court issue a subpoena compelling Gutierrez's deposition in Houston for use in the Louisiana lawsuit.

### *The Texas proceeding*

The Co-ops petitioned the Harris County district court under Texas Rule of Civil Procedure 201.2 to enforce the letter rogatory and issue a subpoena compelling Gutierrez's deposition in the Louisiana lawsuit.

Gutierrez and NRG appeared in the district court and jointly moved for a protective order to prohibit the deposition. They urged the district court to apply Texas's apex-deposition rule and find the Co-ops had not satisfied that standard by showing Gutierrez possesses "unique, non-repetitive knowledge" or that "less intrusive means of discovery have been exhausted without success." The motion accompanied Gutierrez's affidavit denying that he has "any unique or superior knowledge of relevant facts concerning the subject matter of the [Louisiana] lawsuit" or "the allegation that [LaGen] improperly classified costs it incurred to settle a matter with the [EPA] as costs related to LaGen's compliance with

6

environmental regulations." As to his role in approving the Consent Decree, Gutierrez stated:

> [I]n 2012, I was [COO] for NRG. In this position, I presented a proposed settlement with the EPA in the matter captioned *Environmental Protection Agency v. Louisiana Generating, LLC* (M.D. La. No. 09-100) to NRG's CEO at that time for his approval, who in turn had received settlement authority from NRG's Board of Directors []. I presented this settlement based on recommendations I received from other NRG employees, including those already deposed in the [Louisiana lawsuit]. These employees conducted an extensive evaluation of the matter prior to presenting any recommendations to me. In other words, while I have knowledge of some facts relating to the [Consent Decree] by virtue of my former position as COO, all of those facts were relayed to me by other NRG employees. As such, I do not have unique or superior knowledge about the allegations asserted in the [Louisiana lawsuit].

Gutierrez and NRG also moved to disqualify the Co-ops' counsel in the Texas proceeding—attorney John S. "Jack" Edwards with the law firm of Ajamie LLP. They asserted that Ajaime serves as local counsel for the law firm of Van Ness Feldman, LLP (VNF), which represents the Co-ops in the Louisiana lawsuit but previously represented NRG and LaGen between 1996 and 2001. According to Gutierrez and NRG, VNF's previous representation creates a conflict of interest because it was substantially related to the Louisiana lawsuit in that VNF advised LaGen on the Big Cajun II power plant acquisition, negotiated power supply contracts, and made filings with the Federal Energy Regulatory Commission (FERC), including opinions about whether LaGen's contracts allowed it to pass through to cooperatives a share of increased costs from changes in environmental

law. They urged the district court to impute VNF's former-client conflict to Ajamie and disqualify Ajaime from representing the Co-ops in their request for a deposition subpoena.

In response, the Co-ops moved to compel Gutierrez's deposition. They challenged whether the apex-deposition rule applies in the letters-rogatory context and, if it did, whether Gutierrez's affidavit was sufficient to invoke the rule's protections. And they asserted that the discovery already conducted on their Louisiana claims showed the need for Gutierrez's testimony because "only Gutierrez—who was the ultimate decision-maker on both the EPA [Consent Decree] and the disputed expenses—can answer questions about his own decision-making process and the primarily verbal communications about what role the plan to shift [] costs onto third parties, including [the Co-ops], played in the settlement."

The Co-ops also opposed disqualification of Ajamie. They responded that the Louisiana courts had rejected LaGen's request to disqualify VNF based on the alleged conflict, and that NRG and Gutierrez's disqualification motion was an improper second bite at the apple. They also disputed that VNF's prior representation of LaGen and NRG in federal regulatory matters was substantially related to the Louisiana lawsuit concerning costs incurred more than a decade after the representation ended.

After a hearing, the district court signed an order (1) denying appellants' motion for protection or disqualification, (2) granting the Co-ops' motion to compel, and (3) ordering Gutierrez to appear for a deposition to be used in the Louisiana lawsuit. Uncertain whether the district court's order was a final, appealable order and out of an abundance of caution, appellants both appealed and petitioned for a writ of mandamus.

## I. Appeal or Mandamus

Before reaching the merits, we must determine whether we have jurisdiction to decide this matter as an appeal, and if not, whether mandamus is proper.

Generally, appellate courts have jurisdiction only over appeals from "final judgments" and certain appealable interlocutory orders. *Lehmann v. Har-Con Corp.*, 39 S.W.3d 191, 200, 205 (Tex. 2001) (holding order or judgment is final for purposes of appeal if "it actually disposes of every pending claim and party" or "it clearly and unequivocally states that it finally disposes of all claims and all parties"); TEX. CIV. PRAC. & REM. CODE § 51.014 (listing appealable interlocutory orders). The trial court's discovery order does not contain any finality language. But by denying Gutierrez and NRG's motion for protection and disqualification and granting the Co-ops' motion to compel, the trial court determined all the issues and rights between the parties and disposed of all the issues in the Co-ops' petition. We thus conclude that the trial court's discovery order is a final, appealable order that

9

we have appellate jurisdiction to review. *See Centennial Psychiatric Assocs., LLC v. Cantrell*, No. 14-17-00391-CV, 2017 WL 6544283, at \*4–\*5 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (mem. op.) (order quashing discovery for use in Tennessee proceeding was final because it disposed of all issues in petition asking Texas court to sustain discovery objections and issue protective order); *Warford v. Childers*, 642 S.W.2d 63, 65–66 (Tex. App.—Amarillo 1982, no writ) (order denying discovery sought under Hawaii commission was final and appealable).

Because we address the trial court's discovery order by appeal, we deny the petition for writ of mandamus. *See Walker v. Packer*, 827 S.W.2d 833, 840–41 (Tex. 1992) (orig. proceeding) (mandamus is inappropriate where relator has adequate remedy by appeal).

## II. Apex Deposition

Gutierrez and NRG argue the trial court abused its discretion by denying their motion for protection and instead granting the Co-ops' motion to compel because the Co-ops did not make the showing required in Texas to take Gutierrez's apex deposition.

## A. Legal standards

Trial courts have broad discretion in matters of discovery. *See Johnson v. Davis*, 178 S.W.3d 230, 242 (Tex. App.—Houston [14th Dist.] 2005, pet. denied). A trial court's decision on a discovery-related protective order is reviewed for an

abuse of that discretion. *See Boales v. Brighton Builders, Inc.*, 29 S.W.3d 159, 168 (Tex. App.—Houston [14th Dist.] 2000, pet. denied). Likewise, we review a trial court's ruling on a motion to compel discovery under the abuse-of-discretion standard. *See Knapp v. Wilson N. Jones Mem'l Hosp.*, 281 S.W.3d 163, 172 (Tex. App.—Dallas 2009, no pet.).

Few cases have addressed disputes involving discovery in Texas for use in a foreign jurisdiction. More than a century ago, the Texas Supreme Court considered whether a Texas trial court could order compliance with letters rogatory from an Illinois court, which requested a deposition in Texas for use in an Illinois proceeding. *See Ex parte Taylor*, 220 S.W. 74, 75 (Tex. 1920). The Court held that under "the general jurisdiction possessed under the Constitution by the District Courts," the Texas trial court had the power to honor the request of the Illinois court and order the deposition. *Id.* The foreign court with jurisdiction over the underlying case determines the relevance and materiality of the evidence sought by the party seeking the Texas deposition under letters rogatory. *Id.* But the Texas court must protect the witness's legal rights, including, for example, the witness's right to avoid compelled production of privileged evidence. *Id.*; *see also In re Issuance of Subpoenas Depositions of Bennett*, 502 S.W.3d 373, 379–80 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (considering whether movants for protective order met burden to show harassing effect of subpoena requested in Wyoming letters rogatory). This

11

overarching principle promotes comity toward other states' courts while vesting Texas trial courts with authority to protect Texas residents subjected to depositions for out-of-state lawsuits.

No Texas case has addressed whether Texas's apex-deposition rule applies to protect the legal rights of a high-level corporate official whose deposition is sought in Texas for use in an out-of-state proceeding. Our rules of civil procedure include a separate rule addressing and entitled "Depositions in Texas for Use in Proceedings in Foreign Jurisdictions," which provides:

> If a court of record of any other state or foreign jurisdiction issues a mandate, writ, or commission that requires a witness's oral or written deposition testimony in this State, the witness may be compelled to appear and testify in the same manner and by the same process used for taking testimony in a proceeding pending in this State.

TEX. R. CIV. P. 201.2; *accord* TEX. CIV. PRAC. & REM. CODE § 20.002. This Court has never interpreted Rule 201.2, but our sister court has construed it to mean that "the Texas rules of civil procedure apply to a request originating from another state for a Texas deposition." *Bennett*, 502 S.W.3d at 377; *see also In re Prince*, No. 14-06-00895-CV, 2006 WL 3589484, at *2 (Tex. App.—Houston [14th Dist.] Dec. 12, 2006, orig. proceeding) (mem. op.).

Yet Texas's apex-deposition doctrine, though known as a "rule," has never been promulgated as such through the rule-making process. *See In re Alcatel USA, Inc.*, 11 S.W.3d 173, 181 (Tex. 2000) (orig. proceeding) (Enoch, J.,

dissenting) (noting apex-deposition rule is judicial creation). The doctrine evolved from guidelines designed to help trial courts determine when Texas Rule of Civil Procedure 192.6 protects high-ranking corporate officials from unduly burdensome, expensive, or harassing discovery. *See* TEX. R. CIV. P. 192.6(b) (allowing courts to limit discovery to protect moving party from "undue burden, unnecessary expense, harassment, annoyance, or invasion of personal, constitutional, or property rights"); *see also Alcatel*, 11 S.W.3d at 181 (Enoch, J., dissenting) (recognizing apex guidelines "protect from harassment" and "arose from an evaluation of the existing Rules of Civil Procedure"); *Wal-Mart Stores, Inc. v. Street*, 754 S.W.2d 153, 154–55 (Tex. 1988) (orig. proceeding) (recognizing potential for harassment that high-level officials face when corporation is frequently sued and official's connection to case is as tenuous as Wal-Mart chair's connection to slip-and-fall case in Wal-Mart store).

In Texas lawsuits, the apex-deposition rule applies "[w]hen a party seeks to depose a corporate president or other high[-]level corporate official." *Crown Cent. Petroleum Corp. v. Garcia*, 904 S.W.2d 125, 128 (Tex. 1995) (orig. proceeding); *see AMR Corp. v. Enlow*, 926 S.W.2d 640, 642 (Tex. App.—Fort Worth 1996, orig. proceeding) ("An apex deposition is the deposition of a corporate officer at the apex of the corporate hierarchy."). The corporate official, or the corporate entity on the official's behalf, invokes the apex protections by filing a motion for protection

accompanied by the affidavit of the official "denying any knowledge of relevant facts." *Crown Cent.*, 904 S.W.2d at 128. Once the corporate official moves for protection and files an adequate affidavit, the trial court must determine whether the party seeking the deposition has "arguably shown that the official has any unique or superior personal knowledge of discoverable information." *Id.* If that showing has not been made, the trial court must grant a protective order and require the party to "attempt to obtain the discovery through less intrusive methods." *Id.* After making a good-faith effort to secure discovery through less intrusive methods, the requesting party may depose the apex official only after establishing that (1) "there is a reasonable indication that the official's deposition is calculated to lead to the discovery of admissible evidence," and (2) "the less intrusive methods of discovery are unsatisfactory, insufficient, or inadequate." *Id.*

**B.    Analysis**

Gutierrez's status as the current CEO and former COO of NRG would implicate the "guidelines for depositions of persons at the apex of the corporate hierarchy" *if* the Co-ops were seeking his deposition in a Texas case. *See Crown Cent.*, 904 S.W.2d at 126, 128 (adopting guidelines that apply "when a party seeks to depose a corporate president *or other high[-]level corporate official*" (emphasis added)); *see also In re BP Prods. N. Am., Inc.*, 244 S.W.3d 840, 842 n.2 (Tex. 2008) (orig. proceeding) (applying apex-deposition rule to "senior corporate

14

official[s]"); *In re TMX Fin. of Tex., Inc.*, 472 S.W.3d 864, 877–78 (Tex. App.— Houston [1st Dist.] 2015, orig. proceeding) (applying apex-deposition rule to COO). That is not the case here. The Co-ops seek Gutierrez's deposition for use in the Louisiana lawsuit. The parties' disagreement about whether the trial court had to apply the apex-deposition rule in this letter-rogatory context before compelling Gutierrez's deposition in Texas is a matter of first impression. But it is not one we need to resolve. Assuming without deciding that the letter rogatory requesting Gutierrez's deposition for use in the Louisiana lawsuit implicates the apex-deposition rule and that Gutierrez's affidavit was sufficient to invoke the rule's protection, the Co-ops have arguably shown that Gutierrez has some unique or superior knowledge of discoverable information. *Crown Cent.*, 904 S.W.2d at 128.

Gutierrez and NRG characterize the Co-ops' evidence as showing, at most, that Gutierrez was a decision maker in NRG's "chain of command," which cannot satisfy the apex-deposition rule. In support, they cite several cases holding that a generalized claim that a corporate official has ultimate responsibility for a corporate decision cannot establish the official's unique or superior personal knowledge of discoverable information. For instance, in *Alcatel*, the plaintiff alleged that "a plan engineered at the highest level of Samsung's executive structure" led to the theft of the plaintiff's trade secrets. *See* 11 S.W.3d at 174–75. The plaintiff sought to depose two of Samsung's highest-ranking executives to develop facts relevant to the alleged

15

scheme. The Texas Supreme Court concluded that evidence tending to show that (1) one of the executives set Samsung's vision, (2) the alleged theft aligned with the goals of that vision, (3) Samsung had invested significant resources in the project that perpetrated the theft such that the executives must have known about it, and (4) the alleged theft "smacks of chairman-level importance" could not show that the Samsung executives had unique or superior knowledge of discoverable information. *See id.* at 176–77. As the Court explained, "many business disputes directly involve the decisions or actions of a high-level officer," but the fact that the high-level officer may have been involved in the relevant dispute does not, standing alone, support the executive's deposition. *Id.* at 180.

In *AMR Corp. v. Enlow*, a case cited favorably in *Acatel*, the court of appeals addressed a somewhat similar argument. There, an airline passenger became intoxicated on a flight and later had a traffic accident with the plaintiff. *AMR Corp. v. Enlow*, 926 S.W.2d 640, 641 (Tex. App.—Fort Worth 1996, orig. proceeding). The plaintiff sued the airline under the Dramshop Act and sought the deposition of its highest-ranking corporate official. *Id.* The plaintiff argued that he "wish[ed] to depose [the official] in order to determine where the authority lies within the organization for making those [alcohol service and flight attendant training] policy decisions so that [he] can understand how and why those policy decisions were made and what precisely the policies in place were." *Id.* at 643. The court of appeals held:

"This testimony amounts to nothing more than the simple, obvious recognition that the highest-ranking corporate officer of any corporation has the ultimate responsibility for all corporate decisions and falls far short of the [*Crown Central*] standard." *Id.* at 644; *accord In re El Paso Healthcare Sys.*, 969 S.W.2d 68, 74 (Tex. App.—El Paso 1998, orig. proceeding) ("A generalized claim that a corporate president has ultimate responsibility for all corporate decisions or has knowledge of corporate policy is insufficient to establish that the corporate president has unique or superior personal knowledge of discoverable information.").

More recently, this Court conditionally granted mandamus relief from a discovery order compelling the deposition of Baylor University's president in a tort suit alleging that the plaintiff was sexually assaulted by university football players. *In re Baylor University*, No. 01-20-00439-CV, 2020 WL 6878411, at *1 (Tex. App.—Houston [1st Dist.] Nov. 24, 2020, orig. proceeding) (mem. op.). The plaintiff alleged that the university president was a fact witness because she "made representations to prospective Baylor students, including [the plaintiff] and her parents, about the safety of Baylor's campus several months before [the plaintiff] was sexually assaulted in her Baylor-owned and Baylor-assigned apartment." *Id.* The plaintiff continued:

> As demonstrated by her own statements, [the university president] is clearly a person with unique personal knowledge relevant to the claims in this lawsuit. [She], for example, has personal knowledge regarding the safety of Baylor's campus with respect to the risk of sexual assault

17

to prospective female students and "the many changes" that Baylor has allegedly made "to ensure a safer and healthier campus."

*Id.* For her part, the president disclaimed in her affidavit that she had unique or superior personal knowledge about the plaintiff's specific allegations, and she stated that she acted based on reports and information provided by others. *Id.* In holding that the trial court erred by compelling the deposition, this Court determined that the record showed that the president had "general knowledge of most, if not all, of the various aspects" of the university but it did not show she had unique or superior personal knowledge about whether Baylor knew its campus was unsafe or that Baylor failed to adequately warn the plaintiff about that problem. *Id.* at *7. The plaintiff's deposition request was also undermined by (1) the president's short tenure before making the statements at issue and (2) the plaintiff's own acknowledgment that "other Baylor employees might have knowledge [of] specific instances of sexual violence on Baylor's campus" or "'mistakes' made by Baylor or 'lessons' that Baylor allegedly learned." *Id.*

Considering these cases, we agree with NRG and Gutierrez that showing merely that an apex official possess apex-level knowledge of the subject matter of a dispute is not enough to compel an apex deposition. But we conclude the Co-ops showed something more.

At the times relevant to the Louisiana lawsuit, Gutierrez was not in his current role as NRG's CEO. Though still a high-ranking official, he oversaw operations.

18

The Co-ops submitted deposition excerpts from NRG and LaGen employees about operational oversight for the Consent Decree and requests for expenditure for Consent Decree and MATS Rule work.

It is undisputed that Gutierrez contributed to NRG's decision to approve the settlement of the EPA claims against LaGen in 2012. V. Shortell, the former vice president of NRG's environmental division, testified:

> Q. . . . As the Vice President Environmental, did you have to sign off on or approve any settlement offer before it could be communicated to [the] EPA?
>
> A. . . . I did not have approval authority so I would have made recommendations to my chain of command, and it would have had approval from them before it could have been made.
>
> Q. Who was in that chain of command?
>
> A. That would have been – so I reported to Mauricio Gutierrez [], the COO.

Gutierrez's affidavit confirmed this. Although Gutierrez stated that he presented the proposed settlement to NRG's CEO based on information he received from others, his acknowledged role as an intermediary means that he was both a recipient and a purveyor of information related to the Consent Decree.[3]

---

[3] As evidence of Gutierrez's involvement in approving the Consent Decree, the Co-ops also point to an order from a federal magistrate judge refusing to prevent his deposition in a separate lawsuit against LaGen by the co-owner of the Big Cajun II power generating plant. *See Entergy Gulf States La., L.L.C. v. La. Generating, L.L.C.*, Civil Action No. 14-385-SDD-RLB, 2021 WL 24686, at *8–9 (M.D. La. Jan. 4, 2021, order). The co-owner's suit includes similar allegations against LaGen of improperly allocated Consent Decree costs. However, the order is not evidence

The Consent Decree is not the allegedly breached contract in the Louisiana lawsuit. It is the power supply contracts at issue. But the Co-ops' breach theory is that LaGen improperly allocated the costs of complying with the Consent Decree as MATS Rule expenditures to its customers. More than one witnesses testified about Gutierrez's role in approving requests for expenditures related to Consent Decree and MATS Rule compliance. For instance, J. Vosburg, LaGen's President, testified that when LaGen was an NRG subsidiary, its operations and environmental groups reported through NRG's "COO group," instead of to her. She identified Gutierrez as having a role in approving spending on the projects at issue in the Louisiana lawsuit. NRG's Senior Vice President of Development, Engineering, and Construction, B. Trammell, did too. He offered some explanation of how NRG evaluated the options for complying with environmental regulations and identified Gutierrez as a decision-maker:

> Q.     . . . If you've got to comply with the environmental regulations, you would more often be looking for your least-cost option?

---

supporting the trial court's discovery ruling here. The order expressly did not consider Gutierrez's status as an apex official. The magistrate judge concluded that, unlike Texas, the federal law did not require "special treatment of 'high-level' corporate managers" in discovery and that Gutierrez's deposition should be allowed because he "was the ultimate decisionmaker on the settlement at issue and would have personal knowledge of his own decision-making process and discussions with other individuals on the settlement." *Id.* at *9. Consequently, the order issued under different guidelines. And we cannot say whether the magistrate judge's ruling was based on something less, more, or altogether different from the evidence submitted by the Co-ops here because it is not before us.

A.    That's correct.

Q.    Who is the [] project team that is making the recommendations to the executives?

A.    In [] the case of this particular project, . . . there were two principals who conducted the evaluation prior to my direct involvement in the project. It would have been J[.] Klumpyan and the environmental compliance director, V[.] Shortell.

Q.    So Mr. Klumpyan and Ms. Shortell would be the persons who would look at the four-step process we've discussed and then make a recommendation to the executives about which option they were [] recommending?

A.    Yes, that's correct.

Q.    And who would be [] the executives that they would have needed to present that type of information to in 2012?

A.    . . . [I]n this case, the decision-maker would have been COO, Mauricio Gutierrez, who was then responsible for recommending the decision to [the] CEO [] and then to our board.

In her testimony, Shortell did not recall whether Gutierrez asked if the Consent Decree costs could be passed through to the Co-ops in the decision-making process.

Read together, the deposition excerpts submitted by the Co-ops also describe an approval process for requests for expenditures for both Consent Decree and MATS Rule work that began in the plant and continued up the chain to and through Gutierrez. LaGen's Technical Services Manager, R. Roland, testified about the approval process for requests for expenditures ("RFEs"):

A.    . . . [Requests for expenditures] were generated on the plant level. Like you saw, I was inputting them. So probably my plant manager would have been the first stop [in the approval

21

process] . . . and worked their way up the chain based on delegation of authority as to how far they had to go.

Q. It goes on to say, we have also briefed Mauricio that this is headed his way. Who was Mauricio?

A. At that time Mauricio Gutierrez was, I believe, the [COO] of the company.

Q. [D]oes that indicate to you that at least at some point in the RFE approval process, because these were [$]55 and $101 million RFEs respectively, that – that they would have to land on his desk for approval?

A. It appears that way, yes.

Consistent with Roland's testimony, Trammel also described an approval process that applied for requests for expenditure for both MATS Rule and Consent Decree work that involved Gutierrez:

Q. Let me ask you about the – the RFE process. Did you go – have to go through the RFE process for both the MATS and the settlement work?

A. Yes.

Q. Are you in the chain of people that has to approve an RFE as it works its way through NRG?

A. I am.

Q. And who is immediately before you in that process?

A. Typically it would be the vice president of whichever construction group is charged with executing the project. In this case, it would have been J[.] Klumpyan.

Q. And who sees it after you've approved? Who does it go to next?

22

A.      . . . [A]t this time, if I recall, it would have gone from me to COO Gutierrez. And then depending on the scope and the amount that's required, it may have gone to other officers beyond him.

Q.      And . . . if it was large enough and significant enough, it might have to go to [the CEO.]

Gutierrez correctly points out that a chain of command for decision-making about the costs at issue in the Louisiana lawsuit implies that others may have the information the Co-ops seek. But as the Co-ops point out, less intrusive methods have already been taken through 20 depositions, including of these lower-level officials, and information is still wanting as to costs allocations, according to the Louisiana letter rogatory. We conclude that Co-ops have shown that Gutierrez arguably has unique or superior personal knowledge of discoverable information. *See Crown Cent.*, 904 S.W.2d at 128; *see also Boales*, 29 S.W.3d at 168 (apex-deposition doctrine does not protect corporate officials who have "first-hand knowledge of certain facts"). We hold the trial court did not abuse its discretion in denying appellants' motion for protection and compelling Gutierrez's deposition.

### III. Disqualification

NRG and Gutierrez contend the trial court abused its discretion by refusing to disqualify Ajamie—the Co-ops' Texas counsel—under Rule 1.09(a)(3) of the Texas Disciplinary Rule of Professional Conduct.

### A. Legal standards

Lawyer disqualification is "a severe remedy" that "can result in immediate and palpable harm, disrupt trial court proceedings, and deprive a party of the right to have counsel of choice." *In re Nitla S.A. de C.V.*, 92 S.W.3d 419, 422 (Tex. 2002) (orig. proceeding) (per curiam) (quoting *Spears v. Fourth Ct. of Appeals*, 797 S.W.2d 654, 656 (Tex. 1990) (orig. proceeding)). Thus, a trial court evaluating a disqualification motion "must strictly adhere to an exacting standard." *In re Thetford*, 574 S.W.3d 362, 373 (Tex. 2019) (orig. proceeding). We review the trial court's refusal to disqualify a lawyer for abuse of discretion. *In re Turner*, 542 S.W.3d 553, 555 (Tex. 2017) (orig. proceeding) (per curiam). "A trial court abuses its discretion when it acts in an unreasonably or arbitrary manner or, stated differently, when it acts without reference to guiding rules or principles." *In re Meador*, 968 S.W.2d 346, 353 (Tex. 1998) (orig. proceeding).

Although the disciplinary rules are not intended as standards for procedural decisions, courts often look to them as guidelines in deciding whether to grant a motion to disqualify counsel. *Nitla*, 92 S.W.3d at 422; *Nat'l Med. Enters. v. Godbey*,

924 S.W.2d 123, 132 (Tex. 1996) (orig. proceeding). "In resolving the meaning of these rules, we apply statutory construction principles." *In re Caballero*, 272 S.W.3d 595, 599 (Tex. 2008). We review questions of statutory construction de novo. *Id.*

When a movant seeks disqualification based on an alleged violation of a disciplinary rule, he must carry the burden to establish the violation with specificity. *See Spears*, 797 S.W.2d at 656. "Mere allegations of unethical conduct or evidence showing a remote possibility of a violation of the disciplinary rules" do not satisfy the exacting standard. *Id.* In addition, the party seeking disqualification based on violation of a disciplinary rule must also "demonstrate that the opposing lawyer's conduct caused actual prejudice that requires disqualification." *Nitla*, 92 S.W.3d at 422; *see also Meador*, 968 S.W.2d at 350 ("a court should not disqualify a lawyer for a disciplinary violation that has not resulted in actual prejudice to the party seeking disqualification").

Rule 1.09 deals with conflicts of interest that arise in connection with former clients. Relevant here, subsection (a)(3) provides that, without prior consent, a lawyer who personally has formerly represented a client in a matter may not represent another person in a matter adverse to the former client if the matters are the same or substantially related. TEX. DISCIPLINARY R. PROF'L CONDUCT 1.09(a)(3). Although the phrase "substantially related" is not defined, "it primarily involves situations where a lawyer could have acquired confidential information concerning

a prior client that could be used either to that prior client's disadvantage or for the advantage of the lawyer's current client or some other person." TEX. DISCIPLINARY R. PROF'L CONDUCT 1.09 cmt. 4B. Matters are substantially related "when the similarity of the facts involved creates a genuine threat that confidences revealed to the client's former counsel will be divulged to his present adversary." *Thetford*, 574 S.W.3d at 374 (cleaned up). "Neither conclusory statements of similarities nor facial similarities will suffice—the movant must delineate specific facts that tie the former and current representations together." *Id*. "A substantial relationship may be found only after the moving party delineates with specificity the subject matter, issues and causes of action common to prior and current representations and the court engages in a painstaking analysis of the facts and precise application of precedent." *In re Murphy*, No. 14-08-01017-CV, 2009 WL 707650, at *5 (Tex. App.—Houston [14th Dist.] Mar. 5, 2009, orig. proceeding) (mem. op.) (cleaned up).

If a lawyer is disqualified this way, any firm with which the lawyer is associated is also disqualified under Rule 1.09(b). TEX. DISCIPLINARY R. PROF'L CONDUCT 1.09(b) ("[W]hen lawyers are or have become members of or associated with a firm, none of them shall knowingly represent a client if any one of them practicing alone would be prohibited from doing so[.]"); *see also In re Epic Holdings*, 985 S.W.2d 41, 52 (Tex. 1998) (orig. proceeding).

**B.     Analysis**

NRG and Gutierrez have not asserted that Ajamie has its own conflict of interest either because it is co-counsel for the Co-ops in the Louisiana lawsuit or has represented NRG, Gutierrez, or LaGen. And VNF is not counsel of record and has made no appearance on behalf of the Co-ops in either this Court or the trial court below. Only Ajamie is counsel of record here. The disqualification motion thus rests on the imputation of VNF's former-client conflict to Ajamie under Disciplinary Rules 1.09(a)(3) and 1.09(b). TEX. DISCIPLINARY R. PROF'L CONDUCT 1.09(a)(3), (b). To prevail in disqualifying Ajamie then, NRG and Gutierrez must show that (1) Ajamie is associated with VNF, and (2) the matters in the Louisiana lawsuit are substantially related to VNF's prior representation of NRG in federal regulatory matters.

We note a lack of evidence that Ajamie is associated with VNF as local or co-counsel in the record. That is, NRG and Gutierrez's assertion that Ajamie is not independent counsel for the Co-ops in Texas but instead is a local surrogate for or co-counsel with VNF is unsupported by any record citation establishing this association. *See* TEX. R. APP. P. 38.1(i) (appellant's brief must contain "appropriate citations . . . to the record"). Instead, NRG and Gutierrez rely on case law interpreting Rule 1.09's association requirement as extending to litigation co-counsel, including the San Antonio Court of Appeals' decision in *In re CMH*

27

*Homes, Inc.*, No. 04-13-00050-CV, 2013 WL 2446724, at *5 (Tex. App.—San Antonio June 5, 2013, orig. proceeding) (mem. op.).[4]

In *CMH Homes*, the court of appeals observed that the disciplinary rules "do not prescribe a particular definition of 'associated with.'" *Id.* Applying a dictionary definition of "associated," the court determined that the phrase means "to be 'closely connected (as in function or office) with another.'" *Id.* (citing MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 75 (11th ed. 2004)). The court then held that Rule 1.09(b) "include[s] not only partners, employees, and associates within the same firm, but individuals working together on a case or issue regardless of their actual status as a member of the firm, of-counsel, or co-counsel." *Id.*

We find no reason to disagree with the court's interpretation of "associated with" here, but we note the record in *CMH Homes* contained more information about the involvement of the attorney having the former-client conflict than is contained in our record. There, the former-client conflict arose in litigation brought by Duval

---

[4]     NRG and Gutierrez cite a second San Antonio opinion as supporting the existence of an imputed conflict: *City of San Antonio v. Caruso*, 350 S.W.3d 247 (Tex. App.— San Antonio 2011, pet. denied). We presume this citation is an error. *Caruso* is an appeal from the denial of a plea to the jurisdiction on governmental immunity. Although it discusses the standard of review for statutory construction, which we apply to interpret disciplinary rules, it is not a disqualification case and contains no discussion of the disciplinary rules. *See id.* at 250. The quotation and holding NRG and Gutierrez attribute to *Caruso* are found instead in *In re CMH Homes, Inc.*, No. 04-13-00050-CV, 2013 WL 2446724, at *5 (Tex. App.—San Antonio June 5, 2013, orig. proceeding) (mem. op.).

28

County against CMH Homes alleging a fraudulent home financing scheme. *Id.* at *1. The County elected to retain as counsel two lawyers—D. Rumley and B. Gutierrez—who had previously represented private plaintiffs in similar claims against CMH Homes. *Id.* Even though the County Attorney, R. Carillo, had represented CMH Homes as local counsel in some of these private actions, he was tasked by the Duval County Commissioner's Court with retaining Rumley and Gutierrez. *Id.* at *2. In doing so, Carillo met with Rumley or Gutierrez and ultimately approved their contract with the County. *Id.* When the County later sued, Carillo was listed on the original petition as an attorney representing the County against his former client. *Id.* at *2. Carillo withdrew from the representation on CMH Home's request, but the trial court denied a motion to disqualify Rumley and Gutierrez based on their association with Carillo. *Id.* at *2–*3. In conditionally granting mandamus relief, the appellate court held:

> Carrillo was prohibited from representing a current client, Duval County, against a former client, CMH Homes, in a matter that is substantially related to the earlier representation. TEX. DISCIPLINARY R. PROF'L CONDUCT 1.09(a). When Carrillo embarked upon negotiations with Rumley and Gutierrez, he was acting in an adverse manner toward CMH Homes, regarding the exact same issues out of Store 214, and the presumption attached. Moreover, Carrillo's name appeared on the pleadings as Attorney for Duval County and his motion to withdraw acknowledges [his] position as Attorney for Duval County in the suit filed against CMH [Homes]. Based on the presumption of shared confidences, Carrillo's involvement necessitated the disqualification of Rumley and Gutierrez.

*Id.* at *7.

Here, in contrast, Ajamie and VNF are not listed on any pleading as co-counsel for the Co-ops in either the Texas or Louisiana proceedings. And beyond Ajamie's acts in service of obtaining discovery for use in the Louisiana lawsuit, there is no information about how Ajamie and VNF are "associated," i.e., "closely connected (as in function or office) with another" or "working together on the case[s] or issue[s]." Even if that is something the parties or trial court implicitly understood, it is not reflected in the appellate record.

In addition, to satisfy the substantial relationship test as a basis for disqualification, NRG and Gutierrez had to prove that the facts of VNF's previous representation are so related to the facts in the Louisiana lawsuit that a genuine threat exists that confidences revealed to VNF will be divulged to the Co-ops. *See Thetford*, 574 S.W.3d at 374. They contend they did so through evidence that VNF represented NRG and LaGen during the formation of the power supply contracts and that VNF's representation included:

> (1) regulatory approval of the [power supply contracts] in 2000[;]
> (2) FERC filings related to the acquisition of [Big Cajun II] assets—for which the environmental compliance status was represented to FERC by VNF and is at issue in the [Louisiana lawsuit][;] and (3) other legal services from 1996 to 2001 on specific issues relating to federal energy regulatory matters.

NRG and Gutierrez cite *In re Sharplin*, No. 2-05-386-CV, 2006 WL 2167179, at *1 (Tex. App.—Fort Worth Aug. 3, 2006, orig. proceeding) (mem. op.), in support. There, the court considered whether the trial court abused its discretion by

30

refusing to disqualify the law firm of Kelly, Hart & Hallman, P.C. ("KHH") from representing Southwest Environmental Services, Inc. ("Southwest") because a KHH lawyer, as part of his past employment and under a joint defense agreement and the joint defense privilege, had obtained confidential information in a prior case about substantially related matters. *Id.*

The appellate court compared the two cases. In the first case, D. Sharplin, Jr., the relator seeking KHH's disqualification, served as a consultant and executive for a company that tested underground fuel storage tanks. The company was investigated and charged by federal agencies. *Id.* During the investigation and the pendency of the criminal case, Sharplin provided the KHH attorney with information about "applicable regulatory standards, regulatory enforcement, leak detection alternatives, third-party certifications, intrinsic safety for leak detection alternatives, regulatory compliance alternatives, quality control, and [his] management of [the company] in keeping with [his] interpretation of these issues." *Id.* And in the second case, KHH represented Southwest in a suit against another underground fuel storage tank testing company controlled by Sharplin seeking, among other things, "declaratory relief concerning its rights under sublicensing and settlement agreements and alleging defamation, breach of contract, and tortious interference with business relations." *Id.* at *2. However, "shortly after KHH appeared as Southwest's co-counsel, Southwest's theory of the case began to change." *Id.*

31

Southwest, for the first time, asserted complaints involving regulatory compliance, safety, and quality control issues, accusing Sharplin of criminal acts and disclosing evidence related to Sharplin's prior employment. *Id.*

The appellate court ultimately held that KHH should be disqualified, reasoning:

> In determining whether the factual matters in the pending suit are substantially related to the matters in the previous suit, the factual matters "do[ ] not need to be 'relevant' in the evidentiary sense. . . . [They] need only be akin to the present action in a way reasonable persons would understand as important to the issues involved."

*Id.* at *5. And there, the cases were similar in more than one way. Both involved Sharplin personally as the dominant, controlling figure in the operation of the corporation. Both involved alleged wrongdoing by Sharplin-controlled corporations in testing and leak detection. Both involved risks of explosions. And both involved allegations of criminal behavior.

We agree with the Co-ops that the record reflects fewer similarities here. VNF's prior representation involved federal energy regulatory advice. VNF's current representation concerns whether pollution control costs were incurred to comply with old or new environmental laws, namely the 2012 Consent Decree or the 2012 MATS Rule. The record does not establish with specificity the overlap between them. *See In re Drake*, 195 S.W.3d 232, 237 (Tex. App.—San Antonio 2006, orig. proceeding) (reversing trial court's disqualification order, where there

32

was no evidence that facts material to the resolution of the current case were related to the facts in the prior cases handled by counsel).

Although NRG claims the matters are substantially related because both touch the power supply contracts and the Big Cajun II power generating plant, the exhibits show only a facial similarity, which is not sufficient. *Thetford*, 574 S.W.3d at 374 ("Neither conclusory statements of similarities nor facial similarities will suffice—the movant must delineate specific facts that tie the former and current representations together."). For instance, NRG and Gutierrez cite a memo obtained from VNF in discovery, entitled "Potential Utility Liability for Consequential Damages," as evidence that VNF researched contract law issues. But the Louisiana lawsuit does not involve consequential damages. NRG and Gutierrez also cite a 1997 draft contract under a cover memorandum prepared by a different law firm that does not specifically identify any VNF attorneys. While VNF apparently received the draft contract because it was in VNF's files, that is not evidence that VNF participated in drafting or negotiating the power supply contracts.

In early 2000, VNF represented LaGen before FERC. Specifically, VNF petitioned FERC for acceptance of LaGen's market-based rate schedule and filed the power supply contracts in connection with it, but nothing connects the FERC work to the Louisiana lawsuit alleging misallocation of costs in the performance of those contracts, as amended, more than a decade later. In February 2000, a VNF

33

attorney was copied on an email from a different law firm. Attached to the email was a draft letter to one of the Cooperatives. The paper copy produced by VNF in discovery reflects that a VNF attorney suggested changes to a paragraph addressing FERC orders related to prohibitions on undue discrimination in access to electric transmission. But there are no transmission-related charges at issue in this suit. Then, in March 2000, VNF filed an application at FERC seeking authorization for LaGen to issue debt. Attached to this filing was a Preliminary Offering Circular for the debt. The Circular discussed environmental matters, but it shows that the legal matters about the bonds were evaluated by other law firms.

The test for abuse of discretion is whether the trial court acted without reference to any guiding rules or principles or acted in an arbitrary or unreasonable manner. *See Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985). On this record, we hold that it was not an abuse of discretion for the trial court to conclude that no substantial relationship existed between the former and current representations and to deny the motion to disqualify.

## Conclusion

We affirm the trial court's order.


Sarah Beth Landau
Justice

Panel consists of Justices Landau, Countiss, and Guerra.

34