# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-25-00696-CV

---

**D. L. J., Appellant**

**v.**

**M. D. S., Appellee**

---

### FROM THE 33RD DISTRICT COURT OF SAN SABA COUNTY
### NO. 10,244, THE HONORABLE J. ALLAN GARRETT, JUDGE PRESIDING

---

### M E M O R A N D U M   O P I N I O N

Appellant D.L.S. (Father) appeals the district court's order terminating his parental rights to his nine-year-old daughter S.M.E.W. ("Sarah"). In four issues on appeal, Father asserts that (1) the district court abused its discretion by failing to disqualify opposing counsel; (2) the district court erred in granting partial summary judgment terminating Father's parental rights because Father raised genuine issues of material fact relating to whether termination of his parental rights was in Sarah's best interest; (3) the district court's proceedings violated Father's due-process rights; and (4) the district court abused its discretion by denying his motion for new trial. Because we conclude that Father raised genuine issues of material fact relating to whether termination was in Sarah's best interest, we will reverse the district court's order and remand for further proceedings.

## BACKGROUND

Stepfather and Sarah's biological mother, C.E.S. (Mother), filed a petition for termination of Father's parental rights and for adoption of Sarah by Stepfather. Sarah was five years old at the time the petition was filed. As grounds for termination, the petition alleged that Father had engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangers the physical or emotional well-being of the child, *see* Tex. Fam. Code § 161.001(b)(1)(E), and that Father had knowingly engaged in criminal conduct that had resulted in his conviction of an offense and confinement or imprisonment and inability to care for the child for not less than two years from the date the petition was filed, *see id.* § 161.001(b)(1)(Q) (current version at § 161.001(b)(1)(P)).[1]

Mother died in 2024 and is no longer a party to these proceedings. Stepfather later filed a motion for partial summary judgment on his claim for termination of Father's parental rights. Stepfather did not move for summary judgment on the ground of endangerment. Instead, he alleged that Father had knowingly engaged in criminal conduct that had resulted in his conviction of an offense and confinement or imprisonment and inability to care for the child for not less than two years from the date of filing the petition, *see id.*, and that Father had been convicted of the offense of aggravated sexual assault of a child, *see* Tex. Fam. Code § 161.001(b)(1)(L)(viii), a new allegation that had not been included in the original petition for termination but was included in an amended petition that Stepfather filed the day before the

---

[1] In 2025, the Legislature removed Section 161.001(b)(1)(O) as a statutory ground for termination, which resulted in the re-lettering of the statutory grounds for termination that had followed ground (O). *See* Act of May 28, 2025, 89th Leg., R.S., ch. 211, § 2, Tex. Gen. Laws 573, 574–75 (codified at Tex. Fam. Code § 161.001; effective Sept. 1, 2025). We refer to the version of the statute that was in effect at the time Father's parental rights were terminated.

hearing on his motion for partial summary judgment. The motion for partial summary judgment also alleged that termination of Father's parental rights was in Sarah's best interest.

Stepfather's summary-judgment evidence included information relating to Father's criminal history. In 2015, Father was charged in a three-paragraph indictment with committing the offenses of continuous sexual abuse of a child, F.B.M., who was then younger than 14 years of age (Count I), and tampering with a witness, F.B.M., either with intent to influence the witness to abstain from or discontinue the prosecution (Count II, paragraph I) or with intent to influence the witness to testify falsely (Count II, paragraph II).[2] Father was convicted of the lesser-included offense of aggravated sexual assault of a child and sentenced to forty years' imprisonment for that offense in June 2016, before Sarah was born. Father was also convicted of witness tampering (the judgment of conviction does not specify whether he was convicted under paragraph I or II) and sentenced to twenty-five years' imprisonment for that offense, with his sentence to run concurrently with his sentence for aggravated sexual assault of a child. According to Father's "Basic Information Relating to Offender (Inmate) of Texas Department of Criminal Justice," a certified copy of which was attached to the summary-judgment motion, the "Maximum Expiration Date" of Father's sentence is June 9, 2056, and the earliest date of his parole eligibility is June 11, 2036.

Stepfather's summary-judgment evidence also included Stepfather's affidavit from March 2024, in which he averred that Sarah has resided with him since she was 18 months old, that he is the only father Sarah has known, that his home with Mother was the only home Sarah had ever known, and that he believed changing that home would pose an emotional danger to Sarah in light of Mother's recent death.

---

[2] The record does not reflect the relationship between F.B.M. and Father.

3

The district court also had before it a 2022 adoptive social study and home screening on Stepfather's home that was conducted by Michael McShan, a former CPS investigator. McShan explained that his investigation and evaluation included direct in-home interviews of all primary parties in the study and one announced home visit, observing Sarah in the home and "evaluating the quality of her care and relationships." He observed that Stepfather and Mother had been legally married for five years, that their marriage and relationship were stable, and that "[t]he relationship is beneficial for the child." Regarding the home, McShan observed that the family residence was a three bedroom / two bath home located in a rural / residential area that "exceeds all requirements to meet the needs of the child" and was "in good physical condition." McShan explained,

> During the home visit the residence was clean, well-ordered and conducive to the physical needs of the child. The home is appropriately furnished with a variety of amenities directly related to the needs of the child. The investigator observed the child in the home and she appeared to be physically comfortable in this environment.

Regarding his observations of Sarah, McShan recounted,

> [Sarah] was observed in the family home. The evaluation of her comfort and attachment was predicated on interviews and observations. During our visit [Sarah] was clean, appropriately attired and gave every indication that she was comfortable and satisfied. Interactions with the adoptive parent indicated a strong bonding process between the child and her adoptive stepparent. [Sarah] knows [Stepfather] as her father. She has no knowledge of her biological father. She also has a positive relationship with [Stepfather's father] who lives in the home several days a week. The connection between the child and her family was normal, natural and very strong. All indicators verify [Sarah] is happy and well cared for.

4

[Sarah] attends kindergarten at Cherokee ISD.  She also attends a youth program at the Baptist Church.  During my visit she played with a puzzle.  She is a happy and well-behaved child.

McShan also summarized his observations of Stepfather:

[Stepfather] is thirty-two (32) years old.  He is in excellent health.  He is a family man with integrity and a strong work ethic.

He is employed by Llano Station, as a mechanic. [Stepfather] has completed his GED.  He maintains adequate resources to meet the needs of the family.

[Stepfather] states and demonstrates his love and dedication to [Sarah]. [Stepfather and Mother] are proactive in ensuring that [Sarah] is safe, stable and loved without regard to biological or personal obligations. The best interests of the child have and will continue to be their primary concern.

[Stepfather] has one criminal conviction. He received a DWI in 2011. He completed all requirements related to the DWI. [Stepfather] has no documented Child Protective Services history.

[Stepfather] verifies his understanding of the legal and moral ramifications of the adoption.  He states he will use every resource available to ensure [Sarah] is safe and protected.

Regarding Stepfather's father, who was "in the home a couple of days a week," he "has a landscape business and works out of town most weeks."  McShan added, "[Sarah] obviously loves [Stepfather's father] and he is an important part of her life."  McShan concluded the 2022 study with his recommendation "that the adoption of [Sarah] by [Stepfather] be consummated without delay" and that "[t]he best interest and safety of [Sarah] will be served by this action."

Summary-judgment evidence submitted by Father included his unsworn declarations in which he stated, among other things, that:

Sarah and his son, Sarah's half-brother, "mean everything to him," and he talks to his son from prison, teaching him how to fish and hunt and "express[ing] the importance of the Church, God, and the power of Prayer."

Father receives $300 per month from different family members to provide for his needs and that "[i]f need be, to help my family support [Sarah]," he "would gladly have those funds directed for her care and support."

When Sarah visits Grandmother and her partner Reta Peel at their home, "she is given the world" and treated like "a princess."

Stepfather "still has a drinking problem" and engaged in "verbal and mental abuse" against Mother when they were living together, while Stepfather's father vapes "hemp oil" in the same room as Sarah and has a history of family violence.

Father's plan was for Sarah to live with Grandmother and Peel and to be adopted by Peel. Following Mother's death, Sarah currently "has no female to attend to her."

Grandmother was present when Sarah was born, and she had provided housing for Mother and Sarah for the first year of Sarah's life.

Mother reportedly died of a self-inflicted gunshot wound at Stepfather's house, "one day after leaving [Stepfather] for a period and returning" because Stepfather "was seeing another woman."

Father believed the conditions inside and outside Stepfather's house are "dirty, messy, and perhaps even dangerous to a child."

Father also submitted two letters from CPS, one from 2023 and one from 2024, notifying him that CPS had "received a report concerning the possible neglect / abuse of a child," presumably Sarah, while Sarah was living with Stepfather and Mother, although Father included no further documentation elaborating on the reports.

Father's summary-judgment evidence also included statements from Mother, Grandmother, and Peel. Mother had made a sworn statement in 2019 indicating that she wanted Grandmother to have parental rights to Sarah "in the event that [Mother] was ever unable to take care of her." Peel submitted a sworn statement in which she stated that she had observed Stepfather's father "smoking his vape in the living room." She also filed an affidavit stating her belief that Stepfather was having an affair with another woman at the time of Mother's death and was responsible for Mother's death. Grandmother submitted a statement in which she stated that Stepfather's father "vapes" marijuana and "drinks alcohol and keeps it in the house." Grandmother also submitted a statement that Sarah loves Father and had talked to him over the phone when he was in prison. Grandmother and Peel submitted a joint affidavit in which they averred the following:

> [Father] has asked that we, [Grandmother] and Reta Peel, keep his daughter [Sarah] safe and happy and see to her every need.

> We lovingly accept that responsibility. [Sarah] has been loved and cherished by us, beginning the first day of her life, October 8, 2016.

> Reta Peel and I have been friends for over 40 years. We don't drink alcohol. We don't smoke or vape marijuana. We don't use God's name in vain. We don't say 3 or 4, or even one curse word in every sentence.

> All kids love Reta and Reta loves all kids. She was not blessed with any of her own, so she helped me raise my 3 children, 13 grandchildren and all their descendants.

> Reta was injured in an accident while living in Kermit, Texas, working for Winkler County. She was awarded total disability.

> In 2006 I moved to San Saba, as Reta's housekeeper.

7

In 2008, at the age of four, my great grandson, Brenden McCall, needed a place to live and someone to provide funds to help with his care. Reta graciously agreed to be that person. As Brenden grew, his needs became more expensive. Reta then adopted him to be able to provide for his needs. Brenden McCall Peel graduated in 2023. He made the A-B honor roll all through school. He now has a good job with Ace Hardware in San Saba, Texas.

In 2021 my grandson [Sarah's half-brother], who had been placed by CPS with 2 of his half-brothers and his half-sister, was kicked out by his step grandmother. He called and talked to Reta and within 20 minutes we were on our way to Leggett Texas, to pick him up. His mother, who lives 2 blocks away, who has bought him a few clothes and shoes in the last 3 years, doesn't support him and won't give up her rights. Reta can't adopt him and draw money to take care of him, yet she furnishes him a place to live, school clothes every year, his own bedroom, plenty of food to eat, $10 a day for lunch money and we both love and cherish him.

[Sarah] and her Mother moved into Reta's home the day [Sarah] came home from the hospital, October 8, 2016. They were welcomed by everyone in the household. [Sarah] learned to walk and talk in this home. They lived here over 18 months, rent free. Reta paid for food and anything else they needed.

As [Sarah] got older, [Mother] found a job and I, [Grandmother], babysat my granddaughter.

When they moved, we visited frequently and took food and clothing to them and gifts to [Sarah] and [Mother], wherever they lived. That did not change when they moved in with [Stepfather]. One winter they were in need of a heater for their small camper trailer. Reta wanted to be sure [Sarah] was warm enough and said [Sarah] needed the heater worse than we did. We all agreed. She took the one off of her living room wall and took it to them.

[Sarah] will have her own bedroom, just as [Sarah's half-brother] and I each have our own. Due to Reta's injuries, she sleeps in a recliner, in the living room.

Everyone in this home and many relatives of [Sarah], who live in San Saba, love her and want what is best for her. We all grieve at the loss of her mother.

We hope you will decide that Reta's home is the best place for [Sarah], because she will be living with family, her paternal grandmother and [Sarah's half-

brother]. Reta considers [Sarah] to be her family, too, just as she does [Sarah's half-brother].

[Grandmother] draws a monthly SS check for $867.00. [Father] receives $300.00 monthly from family members. In September of this year, [Father] will be 62. He will be able to file for [Sarah] to get SS Benefits in June of this year. Reta and [Grandmother] have each opened [Sarah] a savings account. Reta's monthly income from Social Security is $2,260.00. Reta's Tithe Account, used to help people in need, has a current balance of $2,102.54. Reta's regular checking account has a current balance of $2,707.00. She owns her own 3-bedroom home, free and clear, valued at $79,730.00.

We will all be happy to make it our priority to [en]sure that [Sarah] is well taken care of. She will always be well loved.

Grandmother, in her status as Intervenor, filed a response in opposition to the motion for partial summary judgment that included affidavits from Grandmother and Peel containing additional evidence relevant to the best-interest inquiry. Grandmother's affidavit included the following:

For approximately the first year and a half of her life, [Sarah] along with [Mother] lived in our home. After [Mother] and [Sarah] moved out, I, along with Reta Peel continued to visit them approximately once a month, taking them groceries, clothes, or other things they needed.

I was actively involved in [Sarah's] life up until a little under 2 years ago when Stepfather, [Mother's] boyfriend, made the decision that [Mother] could no longer allow me to have a relationship with my granddaughter.

[Sarah] has been living with [Stepfather] and [Stepfather's father]. Both men are known to drink, at times excessively, while [Sarah] is in their care. It is also known that [Stepfather's father] has vaped marijuana while [Sarah] was in the same room.

[Sarah's] 16-year-old half-brother lives with Reta and me. We have provided him with a stable, loving and supportive life as we would like to do for [Sarah].

9

When we pick up [Sarah] for visits she is happy and excited. She talks and plays games in the car, like I Spy, but when its time for her to go back to [Stepfather], she doesn't want to go back. She tries to come up with ways to stay. She asks, "Do I have to go," "Why do I have to go," "Can I spend the night." Then she sits quietly in the car on the ride back to [Stepfather]'s house and doesn't engage much.

I believe it is in [Sarah's] best interest that I as her grandmother have continuing and frequent access to [Sarah]. It is also in [Sarah's] best interest to have continuing and frequent contact with her brother.

Peel's affidavit included the following:

We are both eager to have [Sarah] back in our lives. She is an exceptional child and since she spent the first year and a half after she was born, in my home and I came to love [Sarah] and her mother as family, I am ready and willing to support her in everything she does and provide her with anything and everything she needs, most of all, a lot of love.

After the first 3 months. I saw [Stepfather], [Mother], and [Sarah] at Mill Pond. It was July 4th. When [Sarah] saw me she screamed "Reta." She then came running and jumped up in my arms.

Would you be comfortable if your 7-year-old daughter or granddaughter lived with two men that aren't even kin to her, with no woman in the house to help her if she needs help taking a bath or washing her hair or for any other reason? [Sarah] needs her grandmother to be there for her when she needs her.

Both or these men drink alcohol and [Stepfather's father] smokes marijuana in a vape, in the room with [Sarah]. Someone mentioned that if [Sarah] was drug tested the results might be positive because [Stepfather's father] vaped marijuana in the room with her all the time.

The district court held a brief hearing on the summary-judgment motion, at which no witnesses testified but the district court heard arguments on the motion from counsel for Stepfather and Grandmother. The district court also admitted into evidence a two-page letter

10

from Child Protective Services (CPS) to Stepfather informing him that it had "ruled out" an allegation of neglectful supervision of Sarah by Mother but did not contain any specific information about the allegation. At the conclusion of the hearing, the district court took the matter under advisement and later issued an order granting Stepfather's motion for partial summary judgment. Father filed a motion for new trial and a notice of appeal. This Court dismissed the appeal for want of jurisdiction because the order granting partial summary judgment was interlocutory and not appealable. *See [D.L.J.] v. [M.D.S.]*, No. 03-24-00498-CV, 2024 WL 4520894, at *1-2 (Tex. App.—Austin Oct. 18, 2024, no pet.) (mem. op.). Father later filed a motion to vacate the interlocutory order, alleging the discovery of new evidence involving Stepfather's conduct and the conditions at Stepfather's home.

The case proceeded to a final hearing on Stepfather's petition for adoption. At the conclusion of the hearing, the district court took the matter under advisement and later issued an order granting Stepfather's adoption of Sarah.[3] This appeal followed.[4]

---

[3] Neither the order granting summary judgment nor the order of adoption specified the statutory grounds on which the district court based its judgment terminating Father's parental rights, in violation of the requirement that in a suit for termination of the parent-child relationship, "the judgment must state the specific grounds for termination." *See* Tex. R. Civ. P. 306. We also observe that neither order stated that the district court had found that termination of Father's parental rights was in Sarah's best interest. However, Father did not object to these omissions in the court below and has not raised this issue on appeal.

[4] After Father filed his notice of appeal from the adoption order, this Court abated the appeal and remanded the case to the district court for clarification as to whether the district court intended its order to be final and appealable, as the order did not contain any finality language and did not reference Grandmother's claim for conservatorship of Sarah. *See D.L.J. v. M.D.S.*, No. 03-25-00696-CV, 2025 WL 3247111, at *2 (Tex. App.—Austin Nov. 25, 2025) (per curiam) (order and mem. op.). Following remand, the district court issued an order clarifying "that it was the intent of the District Court that the Adoption Order in cause number 10244 signed by the Court on August 26, 2025, be a final judgment and appealable for all purposes."

## DISCUSSION

**Motion to disqualify opposing counsel**

In his first issue, Father asserts that the district court erred in failing to disqualify opposing counsel. Stepfather's counsel, both in the court below and on appeal, is the San Saba County Attorney, who is charged by statute with representing the Texas Department of Family and Protective Services (the Department) in actions brought by the Department in that county. *See* Tex. Fam. Code § 264.009(a). While this case was pending in the court below, allegations of neglectful supervision were made against Stepfather and Mother that were investigated by CPS and ultimately "ruled out," and no action was ever brought against them by the Department. Father argues that because of the CPS investigation, the district court should have disqualified Stepfather's counsel from the case based on Texas Disciplinary Rule 1.06(b)(1), which provides that "a lawyer shall not represent a person if the representation of that person involves a substantially related matter in which that person's interests are materially and directly adverse to the interests of another client of the lawyer." Tex. Disciplinary Rules Prof'l Conduct R. 1.06(b)(1).

"Lawyer disqualification is 'a severe remedy' that 'can result in immediate and palpable harm, disrupt trial court proceedings, and deprive a party of the right to have counsel of choice.'" *In re Thetford*, 574 S.W.3d 362, 373 (Tex. 2019) (first quoting *Spears v. Fourth Court of Appeals*, 797 S.W.2d 654, 656 (Tex. 1990) (orig. proceeding) & then quoting *In re Nitla S.A. de C.V.*, 92 S.W.3d 419, 422 (Tex. 2002) (orig. proceeding) (per curiam)). "Accordingly, a trial court evaluating a disqualification motion 'must strictly adhere to an exacting standard.'" *Id.* (quoting *Nitla*, 92 S.W.3d at 422). "We review a trial court's refusal to disqualify a lawyer for abuse of discretion." *Id.* at 374. "A trial court abuses its discretion when it acts in an

12

unreasonable or arbitrary manner or, stated differently, when it acts without any reference to guiding rules or principles." *In re Meador*, 968 S.W.2d 346, 353 (Tex. 1998) (orig. proceeding).

In reviewing disqualification issues, the Texas Rules of Disciplinary Conduct serve as "guidelines—not controlling standards—for disqualification motions." *Nitla*, 92 S.W.3d at 422. "A party moving for disqualification based on a violation of a disciplinary rule must 'establish with specificity' that the disciplinary rule was violated." *Thetford*, 574 S.W.3d at 373-74 (quoting *Spears*, 797 S.W.2d at 656). "Mere allegations of unethical conduct or evidence showing a remote possibility of a violation of the disciplinary rules will not suffice." *Spears*, 797 S.W.2d at 656. Additionally, "[e]ven if a lawyer violates a disciplinary rule, the party requesting disqualification must demonstrate that the opposing lawyer's conduct caused actual prejudice that requires disqualification." *Nitla*, 92 S.W.3d at 422.

The district court would not have abused its discretion in concluding that Father failed to carry his burden to demonstrate that Stepfather's counsel violated a disciplinary rule or that, even if he did, counsel's conduct caused Father any actual prejudice. Because the allegations of neglectful supervision against Stepfather and Mother were "ruled out," no action was brought by the Department against them. The district court could have reasonably concluded that because Stepfather's counsel was not called upon to represent the Department in any action brought against his clients, Father failed to demonstrate that there was an actual conflict of interest in the case. To the extent that Father argues that Stepfather's counsel, in his role as County Attorney, obtained information during the CPS investigation that was relevant to the termination case, Father provided no specificity in his motion to disqualify as to what information Stepfather's counsel might have obtained or how counsel could have used that information against Father in the termination case. Because Father failed to "establish with

13

specificity" that Stepfather's counsel violated a disciplinary rule or caused Father actual prejudice, we cannot conclude that the district court abused its discretion in failing to find that the "severe remedy" of disqualification was warranted here. *See In re Luecke*, 569 S.W.3d 313, 317-19 (Tex. App.—Austin 2019, orig. proceeding) (explaining that party moving for disqualification "had the burden of establishing that disqualification of [opposing counsel], a severe remedy, was proper under the circumstances" and that "allegations of possible prejudice" are not sufficient to satisfy that burden).

We overrule Father's first issue.

**Summary judgment on best interest**

In his second issue, Father asserts that the district court erred in granting summary judgment terminating his parental rights. Specifically, he contends that there are genuine issues of material fact regarding whether terminating his parental rights is in Sarah's best interest.

We review an order granting summary judgment de novo. *Helena Chem. Co. v. Cox*, 664 S.W.3d 66, 72 (Tex. 2023). We examine the evidence in the light most favorable to the nonmovant, indulging every reasonable inference in the nonmovant's favor and resolving any doubts against the motion. *City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex. 2005). To prevail on a traditional summary-judgment motion, the movant has the burden to prove that no genuine issue of material fact exists and that he is entitled to judgment as a matter of law. *JLB Builders, L.L.C. v. Hernandez*, 622 S.W.3d 860, 864 (Tex. 2021); Tex. R. Civ. P. 166a(c).

A trial court may terminate parental rights if it finds by clear and convincing evidence that (1) the parent committed an enumerated statutory ground for termination; and (2) termination is in the child's best interest. Tex. Fam. Code § 161.001(b)(1), (2). "'Clear and

convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007.

"Proceedings to terminate the parent-child relationship implicate rights of constitutional magnitude that qualify for heightened judicial protection." *In re A.C.*, 560 S.W.3d 624, 626 (Tex. 2018). Parental rights have been characterized as "essential," "a basic civil right of man," and "far more precious than property rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (citing *Stanley v. Illinois*, 405 U.S. 645, 651 (1972)). They are "perhaps the oldest of the fundamental liberty interests" protected by the United States Constitution. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *E.E. v. Texas Dep't of Fam. & Protective Servs.*, 598 S.W.3d 389, 396 (Tex. App.—Austin 2020, no pet.). "Consequently, termination proceedings should be strictly scrutinized, and involuntary termination statutes are strictly construed in favor of the parent." *Holick*, 685 S.W.2d at 20. "Because termination of parental rights 'is complete, final, irrevocable and divests for all time' the natural and legal rights between parent and child," a trial court "cannot involuntarily sever that relationship absent evidence sufficient to 'produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *A.C.*, 560 S.W.3d at 630 (quoting Tex. Fam. Code § 101.007; *Holick*, 685 S.W.2d at 20). "This heightened proof standard carries the weight and gravity due process requires to protect the fundamental rights at stake." *Id.*

Consistent with this heightened proof standard, to prevail on a motion for summary judgment seeking the termination of parental rights, the movant must prove, as a matter of law, that there is clear and convincing evidence of both a statutory ground for termination and that termination of parental rights is in a child's best interest. *In re C.M.J.*, 573 S.W.3d 404,

15

410-11 (Tex. App.—Houston [1st Dist.] 2019, pet. denied). "[T]he clear-and-convincing summary-judgment standard is difficult to satisfy." *Id.* at 411. As the Texas Supreme Court has explained,

> On a cold summary judgment record, without having observed a single witness, it would take keen insight to forecast accurately whether probative evidence would or would not produce a "firm belief or conviction" in the mind of the trier of fact. The distinction, in a paper record, between evidence that will merely raise a fact issue and evidence that will be clear and convincing is generally subtle, if not wholly subjective.

*Huckabee v. Time Warner Entertainment Co.*, 19 S.W.3d 413, 422-23 (Tex. 2000).

This is particularly true of the best-interest inquiry. Unlike summary judgment on the statutory grounds for termination, which often allows for a "wholly objective inquiry" into whether the submitted evidence supports the alleged statutory ground, "a child's best-interest determination under subsection 161.001(b)(2) calls for a delicate weighing and balancing of numerous factors that are unique to each child and parent," *In re C.M.J.*, 573 S.W.3d at 412, and "Texas law has always emphasized that trial courts must not weigh the evidence at the summary judgment stage," *Huckabee*, 19 S.W.3d at 422-23. Accordingly, in cases where a trial court must weigh competing summary-judgment evidence to determine whether termination of parental rights is in a child's best interest, granting summary judgment is often improper. *See In re C.M.J.*, 573 S.W.3d at 412; *but see Dowell v. Dowell*, 276 S.W.3d 17, 22 (Tex. App.—El Paso 2008, no pet.) ("There may be instances where the acts or omissions of the parent, standing alone, are sufficient to establish as a matter of law that termination is in the best interest of the children.")

In this case, Father does not contend that there is a genuine issue of material fact regarding the alleged statutory grounds for termination. Instead, he argues that he raised genuine issues of material fact regarding whether termination of his parental rights is in Sarah's best interest.

We review the best-interest finding in light of the non-exhaustive list of considerations set out in *Holley v. Adams*, which include the child's wishes, the child's emotional and physical needs now and in the future, emotional or physical danger to the child now and in the future, the parenting abilities of the parties seeking custody, programs available to help those parties, plans for the child by the parties seeking custody, the stability of the proposed placement, the parent's acts or omissions indicating that the parent-child relationship is improper, and any excuses for the parent's conduct. 544 S.W.2d 367, 371–72 (Tex. 1976); *A.C.*, 560 S.W.3d at 63; *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012); *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). The *Holley* factors are not exhaustive, not all factors must be proved, and a lack of evidence about some of the factors does not "preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *C.H.*, 89 S.W.3d at 27. Moreover, evidence proving the statutory grounds for termination may also be probative of the best-interest finding. *Id.* at 28. "We must consider 'the totality of the circumstances in light of the *Holley* factors' to determine whether [clear and convincing] evidence supports" the best-interest finding. *In re J.M.G.*, 608 S.W.3d 51, 54 (Tex. App.—San Antonio 2020, pet. denied) (quoting *In re B.F.*, No. 02-07-00334-CV, 2008 WL 902790, at *11 (Tex. App.—Fort Worth Apr. 3, 2008, no pet.) (mem. op.)).

17

On this record, we agree with Father that there is a genuine issue of material fact regarding whether termination of Father's parental rights is in Sarah's best interest. This is a case in which the competing summary-judgment evidence must be weighed by the factfinder at trial. On one hand, Stepfather provided uncontroverted evidence that Father was convicted of the offenses of aggravated sexual assault of a child and witness tampering, was sentenced to forty years' imprisonment for the aggravated sexual assault, and would not be eligible for parole until 2036, when Sarah would be almost twenty years old. This evidence weighs heavily in favor of termination. *See In re T.L.E.*, 579 S.W.3d 616, 627–28 (Tex. App.—Houston [14th Dist.] 2019, pet. denied); *In re S.G.*, No. 01-18-00728-CV, 2019 WL 1448870, at *9 (Tex. App.—Houston [1st Dist.] Apr. 2, 2019, pet. denied) (mem. op.); *In re J. I. T.*, No. 01-17-00988-CV, 2018 WL 3131158, at *17 (Tex. App.—Houston [1st Dist.] June 27, 2018, pet. denied) (mem. op.). Additionally, Stepfather's affidavit and the 2022 adoptive home study, summarized above, provided evidence from which a factfinder could determine that Sarah's adoption by Stepfather and continued placement in his home was in Sarah's best interest and that for the adoption to take place, Father's parental rights needed to be terminated.

On the other hand, the home study was conducted from September through November 2022, and there was no subsequent home study showing the conditions of Stepfather's household around the time that Father's parental rights were terminated in July 2024. Notably, the study was based on the conditions and composition of Stepfather's household while Mother was living in the home, and Stepfather provided no evidence regarding the conditions of his home after Mother's death. This is significant because the investigator's observations and recommendations were based on a household composed of both Stepfather and Mother. Additionally, Father and Grandmother provided evidence that Stepfather's father lived with

18

Stepfather in the home and "vaped" marijuana in Sarah's presence, which a factfinder could determine was not in Sarah's best interest. Father also submitted two letters from CPS, one from 2023 and one from 2024, notifying him that CPS had "received a report concerning the possible neglect / abuse of a child," presumably Sarah, while Sarah was living with Stepfather and Mother. Although Father included no further documentation elaborating on those reports, they could at least create a fact issue regarding the conditions at Stepfather's home after the 2022 home study.

Moreover, Father and Grandmother provided evidence of an alternate placement for Sarah if Father maintained his parental rights—placement with Grandmother and her long-time partner Reta Peel. *See Brickley v. Joseph-Stephen*, No. 03-22-00574-CV, 2023 WL 2316346, at *2-3 (Tex. App.—Austin Mar. 2, 2023, pet. denied) (mem. op.) (discussing burden-shifting framework in cases involving incarcerated parent's alleged "inability to care" for child, including parent's burden to "produce some evidence as to how he or she would provide or arrange to provide care for the child during the period of incarceration"). There was evidence tending to show that this placement could also be in Sarah's best interest, including that Grandmother was present when Sarah was born; that "for approximately the first year and a half of her life, [Sarah] along with [Mother] lived in [their] home"; that after that, Grandmother and Peel "continued to visit them approximately once a month, taking them groceries, clothes, or other things they needed"; that when Sarah visited Grandmother and Peel at their home, "she is given the world" and treated like "a princess"; that Mother had made a sworn statement in 2019 indicating that she wanted Grandmother to have parental rights to Sarah "in the event that [Mother] was ever unable to take care of her"; that Sarah loved visiting

19

Grandmother and Peel; and that if she lives with them, she will live in a home with people who love her, including her grandmother and half-brother.

Based on this and other evidence summarized above, we cannot conclude, as a matter of law, that there is clear and convincing evidence that termination of Father's parental rights is in Sarah's best interest. After weighing the competing evidence provided by the parties, a factfinder could ultimately conclude that there is, but that should occur following a trial, not on summary judgment.

We sustain Father's second issue.

**Other issues**

We need not address Father's fourth issue, in which he asserts that the district court abused its discretion by denying his motion for new trial / motion to vacate interlocutory order, which was based on what Father contends is newly discovered evidence relevant to the best-interest inquiry. We are already remanding the case for a trial on the best-interest issue, and our disposition of Father's fourth issue could afford him no greater relief than that. *See* Tex. R. App. P. 47.1. Similarly, we need not address the second part of Father's third issue, in which he contends that his due-process rights were violated because he did not have an opportunity to object to the admission of the two-page letter from CPS to Stepfather informing him that it had "ruled out" an allegation of neglectful supervision of Sarah by Mother. Again, this evidence concerns the best-interest inquiry, which we are remanding for trial. Our disposition of that issue could afford Father no greater relief than that. *See* Tex. R. App. P. 47.1.

Finally, in the first part of Father's third issue, he asserts that his due-process rights were violated because he did not receive sufficient notice of the amended petition alleging

20

that he had been convicted of the offense of aggravated sexual assault of a child. As stated above, the amended petition was filed one day before the hearing on Stepfather's motion for partial summary judgment.

As an initial matter, the motion for partial summary judgment alleged two statutory grounds for termination: that Father had (1) knowingly engaged in criminal conduct that had resulted in his conviction of an offense and confinement or imprisonment and inability to care for the child for not less than two years from the date of filing the petition, *see* Tex. Fam. Code § 161.001(b)(1)(Q), and (2) been convicted of the offense of aggravated sexual assault of a child, *see id.* § 161.001(b)(1)(L)(viii). The first ground for termination was alleged in both the original and amended petition for termination, and Father does not contend that he received inadequate notice of that ground. Thus, to the extent that the order granting summary judgment was based on that ground, there was no due-process violation.

To the extent that the order granting summary judgment was based on the second ground alleged, Father failed to make any showing that he was surprised or prejudiced by the allegation, which is necessary to demonstrate a due-process violation. *See* Tex. R. Civ. P. 63; *Goswami v. Metropolitan Sav. and Loan Ass'n*, 751 S.W.2d 487, 490 (Tex. 1988); *James v. Tex. Dep't of Human Servs.*, 836 S.W.2d 236, 238 (Tex. App.—Texarkana 1992, no writ); *see also Greenhalgh v. Serv. Lloyds Ins. Co.*, 787 S.W.2d 938, 939 (Tex. 1990) ("The burden of showing prejudice or surprise rests on the party resisting the amendment."). Although not included in the original petition, the ground alleging Father's conviction for aggravated sexual assault was included in Stepfather's motion for partial summary judgment, which was filed over a month before the hearing on summary judgment, and there is nothing in the record to suggest that Father was surprised or prejudiced by the allegation, particularly considering that this is the same

21

conviction for which he is currently confined. On this record, we cannot conclude that the district court violated Father's due-process rights by allowing Stepfather to amend his petition to conform to Stepfather's motion for partial summary judgment.

We overrule the first part of Father's third issue and, as stated above, need not consider the second part. *See* Tex. R. App. P. 47.1.

## CONCLUSION

We reverse the district court's order terminating Father's parental rights and granting Stepfather's adoption and remand for trial on the issue of whether termination of Father's parental rights is in Sarah's best interest. Trial must commence no later than 180 days after the mandate is issued in this case. *See* Tex. R. App. P. 28.4(c).

_____

Gisela D. Triana, Justice

Before Justices Triana, Kelly, and Theofanis

Reversed and Remanded

Filed: March 6, 2026

22